ARRINGTON, APPELLANT, *v.* DAIMLERCHRYSLER CORPORATION. ET AL., APPELLEES.

[Cite as *Arrington v. DaimlerChrysler Corp.,*
**109 Ohio St.3d 539, 2006-Ohio-3257.**]

(No. 2005–0243—Submitted November 30, 2005—Decided July 12, 2006.)

540

**O'CONNOR, J.**

{¶ 1} In this appeal involving an asbestos-related workers' compensation claim, we address the propriety of a case-management order requiring all testimony to be presented by videotape rather than through live testimony before the jury. We hold that the right to trial by jury in claims brought pursuant to R.C. 4123.512 is conferred by the General Assembly through statute and does not arise from Section 5, Article I of the Ohio Constitution. We further hold that although the preferred practice is to permit parties to testify live before the fact-finder, the trial court's order that all testimony be submitted through videotaped evidence does not offend the statutory right to trial by jury in claims brought pursuant to the Ohio workers' compensation statutory scheme, R.C. Chapters 4121 and 4123 ("the act").

## Facts and Procedural History

{¶ 2} The appellant, James Arrington, claims that he developed asbestosis as a direct result of occupational exposure to asbestos during the 31 years he was employed by appellee DaimlerChrysler Corporation. He sought compensation and medical payments pursuant to the act. The Industrial Commission denied him the right to participate in the Workers' Compensation Fund, and he appealed to the Summit County Court of Common Pleas, demanding trial by jury.

{¶ 3} The trial court conducted an initial case-management conference governing all asbestos-related workers' compensation claims ("AWC cases") pending before it, including that brought by Arrington. According to minutes of the conference, the trial court announced its "vision" of trials by videotape for the pending claims. It acknowledged that the envisioned process was "experimental" and subject to modification. Arrington and other claimants objected consistently to the order for a video trial.[1] In response, according to minutes of a later case-management meeting, the trial court reiterated its "firm insistence" that the trials proceed by videotape, indicating that cases could be dismissed for want of prosecution if the parties did not prepare videotaped testimony.

---

1. We use the term in accordance with the description of "videotape trials" set forth in Sup.R. 13(B), which states: "In videotape trials, videotape is the exclusive medium of presenting testimony irrespective of the availability of the individual witness to testify in person. All testimony is recorded on videotape * * *."

{¶ 4} Arrington nevertheless persisted in his efforts, moving to vacate the order, submitting supporting documents, including affidavits and analyses of similar cases pending in other courts of common pleas. Relying on our decision in *Fantozzi v. Sandusky Cement Prods.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474, Arrington argued that there was no compelling need to mandate videotape trials and that the order violated his constitutional right to a jury trial and would prejudice his case.

{¶ 5} In disputing the need for trial by videotape, Arrington compared the AWC docket in Summit County to those of other Ohio jurisdictions. He argued that other courts had far more AWC cases pending, but still allowed live testimony in each. He further suggested that using videotaped evidence would not save time or court resources and that the identity of the legal issues in the AWC cases was not a "compelling reason" to order video trials.

{¶ 6} As to prejudice, he contended that the use of videotape would limit his use of large-scale exhibits, hamper his ability to adjust the order of his witnesses and to respond to evidence as it was presented, and deter attorneys from representing plaintiffs in such cases. Relying on his counsel's long experience as a litigator and vague references to opinions of unnamed "jury consultants," Arrington also argued that jurors would not give as close attention to the witnesses on videotape as to those testifying live and that jurors could not as easily assess credibility of witnesses on videotape.

{¶ 7} The trial court denied the motion, noting that there were more than 300 AWC cases pending in Summit County (many for more than one year). The court quoted its statement at an earlier case-management meeting:

{¶ 8} " 'The court, upon examination of all these cases, and consultation with other courts around the state, has determined that video trials are highly appropriate in all of these cases. In reaching this conclusion the court has determined that the costs will be minimalized [sic], the nature of each of the actions is particularly appropriate to the presentation of testimony in such fashion, and the relevant, material testimony [that] will ultimately be presented to the jury will be minimal. This court has also considered the cost and convenience to jurors and potential jurors of the facility of considering the evidence via video in a continuous fashion as against the time and delay involved in a general trial. The video process will also free up courtroom facilities in Summit County, already overburdened and undergoing renovation. It also offers the possibility of cutting costs for experts by allowing an expert to give testimony in several different cases in quick sequence.' "

{¶ 9} The court further noted that Civ.R. 40 and Sup.R. 13(B) [2] allowed video trials and that the use of videotaped evidence would significantly reduce trial time. The court found that the "issues to be resolved in each case by a jury are simple and direct" and that the plaintiffs were "entitled to a prompt, fair, and efficient day in court in order that they might get compensation to which they may be entitled." The court reaffirmed its earlier order that the jury charge, testimony, and exhibits would be presented by videotape, while jury selection and opening and closing statements would be presented live.

{¶ 10} The trial court's case-management order required all parties to file all videotaped testimony prior to trial. Although Arrington timely filed a witness list, he did not file videotaped evidence, maintaining that he and his witnesses were prepared for trial and ready to testify before the jury. One week prior to his scheduled trial date, the trial court acknowledged that Arrington and his witnesses were available to proceed with live testimony but, because he had failed to have testimony recorded, dismissed his case.

{¶ 11} Arrington appealed. The Ninth District Court of Appeals affirmed the dismissal, concluding that Arrington had no constitutional right to a jury and thus no entitlement to "sit face-to-face with a jury, to interact with a jury, or to present live testimony to a jury." 2004-Ohio-7180 at ¶ 23. The appellate court further rejected his claims that Civ.R. 40 violated the Equal Protection, Due Process, and Open Courts Clauses of the Ohio Constitution. Id. at ¶ 26.

{¶ 12} We accepted a discretionary appeal to define the rights associated with the act and to consider the critical interests that compete in this case: a litigant's interest in presenting live witnesses in the prosecution of his claims and the trial court's interests in conducting a trial as expeditiously and efficiently as permitted by constitutional and other guidelines.

## Analysis

{¶ 13} As we recently described, the act "provides the statutory mechanism for providing cash-wage benefits and medical care to victims of work-connected injuries and for allocating the ultimate cost of such injuries to consumers by augmenting the cost of goods or services that are a product of that work in order to reimburse employers for a prescribed insurance premium." *Bailey v. Republic Engineered Steels, Inc.* (2001), 91 Ohio St.3d 38, 41, 741 N.E.2d 121.

{¶ 14} The origins of the act date from 1911, when the General Assembly enacted Ohio's first comprehensive law pertaining to compensation for industrial

---

2. Civ.R. 40, entitled "Pre-recorded testimony," provides: "All of the testimony and such other evidence as may be appropriate may be presented at trial by videotape, subject to the provisions of the Rules of Superintendence." Sup.R. 13, entitled "Videotaped testimony and evidence," sets forth more comprehensive standards for such trials.

injuries. 102. Ohio Laws 524. Although the statute, which set up a voluntary system, survived constitutional challenge, *State ex rel. Yaple v. Creamer* (1912), 85 Ohio St. 349, 97 N.E. 602, it was displaced in 1913 by a compulsory system after Ohio amended its Constitution to include Section 35, Article II, "the fount for all subsequent workers' compensation laws." *Brady v. Safety–Kleen Corp.* (1991), 61 Ohio St.3d 624, 643–644, 576 N.E.2d 722 (Holmes, J., dissenting); 103 Ohio Laws, 72. Section 35 specifically empowered the General Assembly to impose a regime through which a worker who suffers injury or occupational disease caused by conditions in the workplace is compensated through a fund established by compulsory contributions from employers.

{¶ 15} That early incarnation of the act was born of more than simple Progressive Era social interventionism and general public beneficence toward workers. Rather, it was also a specific pragmatic response to the social dissatisfaction with the lack of compensation available to injured workers at common law. *Village v. Gen. Motors Corp.* (1984), 15 Ohio St.3d 129, 131, 15 OBR 279, 472 N.E.2d 1079; *Indus. Comm. v. Weigandt* (1921), 102 Ohio St. 1, 7, 130 N.E. 38. As we explained in *Holeton v. Crouse Cartage Co.* (2001), 92 Ohio St.3d 115, 118–119, 748 N.E.2d 1111:

{¶ 16} "Prior to 1913, the employee's ability to receive compensation for work-related injuries was governed by the common law of torts. Although the principle of vicarious liability had long been recognized at common law, it was far more difficult for the injured worker to recover damages from his or her employer than it was for the stranger to the employment relationship. The injured employee was required to prove that the employer violated a duty of care owed specifically to employees. Even upon overcoming this hurdle, until 1911 the employee was faced with what became known as the 'unholy trinity of common-law defenses'—contributory negligence, the fellow servant rule, and assumption of risk. 102 Ohio Laws 529, Section 21–1. These defenses were truly draconian in their application. * * *

{¶ 17} "The common-law system proved incapable of dealing with the often devastating social and economic consequences of industrial accidents. It became undeniable that the tort system had failed as a regulatory device for distributing economic losses borne by injured Ohio workers and their families and that it should be replaced by a workers' compensation system in which those losses would be charged, without regard to fault or wrongdoing, to the industry rather than to the individual or society as a whole. See, *e.g., Goodman v. Beall* (1936), 130 Ohio St. 427, 5 O.O. 52, 200 N.E. 470; *Indus. Comm. v. Weigandt* (1921), 102 Ohio St. 1, 4, 130 N.E. 38, 38–39; *State ex rel. Munding v. Indus. Comm.* (1915), 92 Ohio St. 434, 111 N.E. 299; *State ex rel. Yaple v. Creamer*, 85 Ohio St. 349, 97 N.E. 602.

{¶ 18} "Accordingly, Section 35, Article II represents a social bargain in which employers and employees exchange their respective common-law rights and duties for a more certain and uniform set of statutory benefits and obligations."

{¶ 19} Ohio's workers' compensation scheme must therefore be recognized as "a balance of mutual compromise between the interests of the employer and the employee whereby employees relinquish their common law remedy and accept lower benefit levels coupled with the greater assurance of recovery and employers give up their common law defenses and are protected from unlimited liability." *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 614, 23 O.O.3d 504, 433 N.E.2d 572. See, also, *Bunger v. Lawson Co.* (1998), 82 Ohio St.3d 463, 465, 696 N.E.2d 1029. With this important understanding in mind, we turn to the issues implicated in this case.

### Section 5, Article I Does Not Confer a Fundamental Right to Trial by Jury in Workers' Compensation Cases

{¶ 20} Arrington argues that a claimant who appeals to a common pleas court from an order of the Industrial Commission denying his eligibility for benefits pursuant to the act is entitled by the Ohio Constitution to a trial by jury. In light of our past rulings and a proper understanding of the act's origins, his claim fails.

{¶ 21} The right to a trial by jury is a venerable one derived from Magna Carta, embodied first in the Northwest Ordinance of 1787, then in the federal Constitution, and thereafter in the Ohio Constitution. *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1; *State v. Ellis* (1918), 98 Ohio St. 21, 120 N.E. 218; Amendment 7 to the United States Constitution; Section 5, Article I of the Ohio Constitution. Designed to prevent government oppression and to promote the fair resolution of factual issues, *Colgrove v. Battin* (1973), 413 U.S. 149, 157, 93 S.Ct. 2448, 37 L.Ed.2d 522, trial by jury is "the crown jewel of our liberty," the " 'most cherished institution of free and intelligent government,' " and the " 'best institution for the administration of justice.' " *Butler v. Jordan* (2001), 92 Ohio St.3d 354, 371, 750 N.E.2d 554 (plurality opinion), quoting Few, In Defense of Trial by Jury (1993) 74. It is well understood that the right is "fundamental," "substantial," *Halliday*, 127 Ohio St. at 284, 188 N.E. 1, and "inviolate." Section 5, Article I, Ohio Constitution.

{¶ 22} The right to a jury trial is not, however, absolute. The Constitution does not entitle all civil litigants to a trial by jury. Instead, it preserves the right only for those civil cases in which the right existed before the adoption of the constitutional provision providing the right. *Kneisley v. Lattimer–Stevens Co.* (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743; *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 396, 169 N.E. 301. Thus, Arrington's assertion of a constitutional right to a jury necessarily entails inquiry into whether the common

law recognized the type of claim he presents. If not, Section 5, Article I of the Ohio Constitution is inapposite.[3]

{¶ 23} Arrington's claim is that he was improperly denied the right to participate in the Workers' Compensation Fund. He fails to demonstrate that the common law recognized such claims.

{¶ 24} Claims for injuries arising from negligence or intentional torts—inside or outside of the workplace—were recognized at common law. Today, those claims typically retain a right to trial by jury. *Bunger v. Lawson Co.*, 82 Ohio St.3d at 466, 696 N.E.2d 1029; *Blankenship*, supra, 69 Ohio St.2d 608, 23 O.O.3d 504, 433 N.E.2d 572 (because intentional torts of an employer do not arise from employment, the employer has no immunity for them under R.C. 4123.74). But Arrington's cause of action is not a common-law negligence claim. It is a basic claim to participate in a compensation scheme created by statute for workers who are injured in the workplace—a scheme specifically designed to avoid the common law. R.C. 4123.74. Indeed, from its very inception, the statutory workers' compensation scheme was intended as a replacement for the void of common-law remedies for workers injured on the job. As the United States Supreme Court observed in rejecting a constitutional challenge to another state's workers' compensation statute, "[a]s between employee and employer, the act abolishes all right of recovery in ordinary cases, and therefore leaves nothing to be tried by jury." *Mountain Timber Co. v. Washington* (1917), 243 U.S. 219, 235, 37 S.Ct. 260, 61 L.Ed. 685.

{¶ 25} A claim for benefits pursuant to Ohio workers' compensation statutes clearly differs from a common-law tort in significant ways. See, e.g., *Blankenship*, 69 Ohio St.2d at 614–615, 23 O.O.3d 504, 433 N.E.2d 572. There is simply no merit to Arrington's averment that his claim is sufficiently similar to common-law negligence to bestow on him a constitutional right to a jury—a conclusion that we have reached before and that we reiterate today. *Fassig v. State ex rel. Turner* (1917), 95 Ohio St. 232, 241–243, 116 N.E. 104; see, also, *State ex rel. Crawford v. Indus. Comm.* (1924), 110 Ohio St. 271, 275, 143 N.E. 574.

{¶ 26} We have never held that a worker seeking to participate in the fund is entitled to a trial by jury because of Section 5, Article I, Section 35, Article II, or any other constitutional provision. Rather, we consistently have held that the rights associated with the act are solely those conferred by the General Assembly. E.g., *Jenkins v. Keller* (1966), 6 Ohio St.2d 122, 126–127, 35 O.O.2d 147, 216 N.E.2d 379; *Westenberger v. Indus. Comm.* (1939), 135 Ohio St. 211, 14 O.O. 56,

---

3. Arrington has correctly abandoned his reliance on the Seventh Amendment to the United States Constitution. The federal constitutional right to trial by jury is inapplicable to state-law claims in a state adjudicatory regime. E.g., *Gasperini v. Ctr. for Humanities, Inc.* (1996), 518 U.S. 415, 432, 116 S.Ct. 2211, 135 L.Ed.2d 659; *Walker v. Sauvinet* (1875), 92 U.S. 90, 92–93, 23 L.Ed. 678.

20 N.E.2d 252. Arrington's right to a jury exists, but only insofar as it was granted by a statute such as R.C. 4123.512. *Robinson v. BOC Group, Gen. Motors Corp.* (1998), 81 Ohio St.3d 361, 365, 691 N.E.2d 667.

{¶ 27} We hold therefore that Section 5, Article I of the Ohio Constitution does not confer a right to a trial by jury on a claimant in an appeal brought pursuant to R.C. 4123.512. The right to trial by jury in an appeal brought pursuant to R.C. 4123.512 is limited to that which the General Assembly confers. Thus, although Arrington incorrectly characterized the source of his right to trial by jury (the Ohio Constitution), he correctly identifies that such a right exists (by operation of statute). We move to the remainder of Arrington's propositions with the statutory right to jury in mind.

**The Right to Trial by Jury, As Conferred by R.C. 4123.512 for an Appeal from an Adverse Administrative Decision in a Workers' Compensation Case, Is Not Violated by a Case–Management Order Issued Pursuant to Civ.R. 40 and Sup.R. 13(B) and Orders Requiring Trial by Videotaped Evidence in an Asbestos–Related Workers' Compensation Case**

{¶ 28} Arrington alleges that the trial court's order to require trial by video deprives him of his "fundamental" right to trial by jury and that Civ.R. 40 and Sup.R. 13(B), upon which the trial court relied in fashioning its order, are unconstitutional as applied here. More specifically, he asserts that the use of those rules to fashion an order requiring trial by video violates this court's holding in *Fantozzi v. Sandusky Cement Prods.* (1992), 64 Ohio St.3d 601, 597 N.E.2d 474, and the portions of the Ohio Constitution that afford equal protection, due process, and open access to courts.

{¶ 29} In addressing these claims, we first note that the jury right to which Arrington refers is not a fundamental one. It is a right conferred by the General Assembly, not the Constitution, and therefore may be constrained. Our review of such constraints is limited to rational-basis review. *Holeton,* 92 Ohio St.3d at 131, 748 N.E.2d 1111.

{¶ 30} Arrington claims that his right to a jury includes the right to present his own testimony and that of his witnesses live and the right to have the jury see him as the case is presented. The claim fails.

{¶ 31} Even were there a constitutional entitlement to a jury in this case, there is no concomitant right to sit "face to face" with the jurors. As the United States Court of Appeals for the Seventh Circuit has recognized, nothing in the Constitution gives a litigant an unqualified right to participate in a trial live rather than by videotape:

{¶ 32} "[The litigant] and some of his witnesses participated in the trial by videoconferencing. He calls this an exclusion from the trial, * * * but he was not excluded. [The litigant] participated in the trial; he testified, presented evi-

dence, examined adverse witnesses, looked each juror in the eye, and so on. Jurors saw him (and he, them) in two dimensions rather than three. Nothing in the Constitution or the federal rules gives a prisoner an entitlement to that extra dimension, if for good reasons the district judge concludes that trial can be conducted without it." *Bustillo v. Hilliard* (C.A.7, 2001), 16 Fed.Appx. 494, 495, 2001 WL 894274. Nor does anything in the act entitle Arrington to give his testimony in three dimensions.

{¶ 33} Moreover, Arrington's complaints of prejudice from being confined to two dimensions are speculative. Given that his refusal to record evidence led to the dismissal of the case before the presentation of any evidence, his claim of prejudice is purely theoretical. At best, he presents a generalized claim akin to a "concern that something important will be lost, but exactly what is difficult to specify and even harder to measure." Bermant and Jacoubovitch, Fish Out of Water: A Brief Overview of Social and Psychological Concerns About Videotaped Trials (1975), 26 Hastings L.J. 999, 1007. That concern, however, demonstrates no prejudice, regardless of how he characterizes it.

{¶ 34} The trial court's decision to conduct trial by video is unusual in its scope, but it is not beyond the pale of orders by other courts in other cases or beyond the boundaries of our prior case law. In *Fantozzi*, we noted that Ohio's courts were the pioneers in the development and use of video trials in civil cases, which began in Erie County as early as 1971, and we affirmed their use after finding valid reasons to support the continued use of videotape trials in civil cases. See *Fantozzi*, 64 Ohio St.3d at 605–606, 608, 597 N.E.2d 474; Hartmus, Videotrials (1996), 23 Ohio N.L.Rev. 1, 3. More than 30 years ago, the Supreme Court of Vermont rejected a claim of inherent prejudice in the use of videotapes to present all sworn testimony by witnesses in a criminal case. *State v. Moffitt* (1975), 133 Vt. 366, 340 A.2d 39. The trial court's order here was thus not one without support in the law.

{¶ 35} Aside from the pragmatic benefits noted by the trial court in fashioning its order, there are many benefits to trial by videotape—for judges, jurors, and witnesses and for litigants like Arrington. Not only do "videotrials hold the promise of making jury service shorter, fairer, and more productive," they also permit the jury to see and hear the trial "without inadmissible testimony or remarks, interruptions, or sidebar conversations." Videotrials, 23 Ohio N.L.Rev. at 4. As the court in *Moffitt* observed, "the editing out of improper questions and inadmissible testimony, and the ordering of the presentation of witnesses to the parties' liking, can only promote the fairness of trial in search for the truth." 133 Vt. at 369, 340 A.2d 39. And in *Fantozzi*, we noted studies that found an array of other perceived advantages to videotaped evidence, including the maximum utilization of juror time; more certainty in scheduling trial events; reduction in

the potential for mistrial, including unintentional judicial influence on the jury; more effective opening statements (which could be based on a more precise understanding of the evidence); the freedom of the judge and counsel to attend to other duties, including other trials, rather than being required to be present to raise and address evidentiary objections; more effective scheduling; better opportunity to research and study evidentiary questions; and the facilitation of appellate review and retrial, if necessary.[4] 64 Ohio St.3d at 606, 597 N.E.2d 474, fn. 2.

{¶ 36} Contrary to Arrington's generic claims of prejudice, commentators note that there is no empirical evidence indicating a depersonalization of the plaintiff at a trial in which jurors observe evidence through videotaped presentation rather than live testimony. Videotrials, 23 Ohio N.L.Rev. at 7–8. To the contrary, at least one group of early studies showed no significant differences between a jury hearing live testimony and a jury observing videotaped evidence in determining negligence or damages or in assessing the credibility of parties, witnesses and attorneys. Id. at 8–10. Interestingly, there is even some indication that Ohio jurors found that any differences between trial by video and traditional trials were advantageous: jurors found that "videotrials were less confusing, less emotionally involving and legally more sound." Id. at 10, citing Bermant, Chappell, Crockett, Jacoubovitch, and McGuire, Juror Responses to Prerecorded Videotape Trial Presentations in California and Ohio (1975), 26 Hastings L.J. 975, 991. More recent commentators even suggest that the trial by video is more holistic, and enhances the testimony of witnesses. Perritt, Video Depositions, Transcripts and Trials (1994), 43 Emory L.J. 1071, 1086.

{¶ 37} Against this backdrop, we reject Arrington's claim that his right to a jury was impermissibly abridged by the trial court's order in the circumstances here, an "appropriate case" for trial by video in accordance with our holding in *Fantozzi*. 64 Ohio St.3d at 608, 597 N.E.2d 474. In an appeal brought pursuant to R.C. 4123.512, Civ.R. 40 and Sup.R. 13(B) do not interfere with the right to trial by jury when a trial judge relies upon the rules to fashion an order requiring all evidence to be submitted by videotape.

{¶ 38} Arrington's amorphous claims that Civ.R. 40 and Sup.R. 13(B), as well as the trial court's order issued pursuant to the authority of those rules, affront the constitutional principles of equal protection, due process, and access to the courts also fail. In more than a dozen states, administrative rules or codes of judicial conduct expressly provide rules similar to those at issue here and authorize electronic and photographic presentation of evidence. 23 Ohio

---

4. Anecdotally, we note that *Fantozzi*, a personal-injury case arising from the workplace, presented a challenge to a video trial by an employer who was found liable, by a jury, for damages of almost $800,000. See 64 Ohio St.3d at 603–604, 597 N.E.2d 474.

N.L.Rev. at 13–14 and fn. 92. And although we expressly did not reach the issue of the constitutionality of the rules in *Fantozzi*, we upheld both as valid after considering their procedural commands in light of constitutional principles. 64 Ohio St.3d at 608–609, 597 N.E.2d 474, fn. 4 and 5. Given their presumed constitutionality, we decline Arrington's invitation to strike the rules as unconstitutional here, particularly in light of the trial court's stated reasons for ordering that the evidence in this trial be presented by video. *State ex rel. Thompson v. Spon* (1998), 83 Ohio St.3d 551, 555, 700 N.E.2d 1281; *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 418–419, 633 N.E.2d 504; Section 5(B), Article IV of the Ohio Constitution. As the appellate court held, 2004–Ohio–7180, ¶ 24, we cannot conclude that the rules lack a rational basis, on their face or as applied, because they were reasonably related to achieving important state goals: the efficient administration of justice, and the timely and equitable resolution of claims. See *Colgrove,* 413 U.S. at 156–157, 93 S.Ct. 2448, 37 L.Ed.2d 522.

{¶ 39} In rendering our decision here, we are not blinded by the promise of technology and its integral role in contemporary society. Questions as to the proper integration of technology into law are complicated ones. In cases in which technology permeates the courtroom, we must guard against the suggestion that technology can be used for "so arranging the world that we don't have to experience it." Max Frisch, Homo Faber (Michael Bullock trans.1959) 178.

{¶ 40} Our conclusion today should not be read as a broad endorsement of the use of new technologies in all cases. We merely recognize the trial court's authority by operation of Civ.R. 40 and Sup.R. 13(B) to issue orders to proceed with trial by video in "appropriate cases" such as this one, one case among many arising from similar administrative adjudications. In so concluding, we caution that in the great majority of cases, even those not presenting discrete factual or legal issues, the preferred practice remains to permit all parties—and particularly plaintiffs—the right to testify live before a jury when the party so requests.

{¶ 41} The judgment of the Ninth District Court of Appeals affirming the dismissal of the appellant's case by the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

MOYER, C.J., LUNDBERG STRATTON and LANZINGER, JJ., concur.

RESNICK, PFEIFER and O'DONNELL, JJ., dissent.

---

### ALICE ROBIE RESNICK, J., dissenting.

{¶ 42} There is nothing in the law that even comes close to providing support, sanction, or justification for the trial court's massive order in this case, which

requires over 400 workers' compensation claimants suffering from asbestos-related occupational diseases to try their claims by prerecorded videotape. There is no cogent argument for requiring an objecting litigant to demonstrate actual prejudice in order to defend centuries of trial practice against the obvious misuse of a modern procedural rule that is designed for cautious application in particular cases. And while perhaps reflective in its ingenuity, there is nothing circumspect about an order that resolves a case-management problem by compelling an entire class of workers' compensation claimants to proceed en masse to trial by videotape upon the justification that their claims share the generic right-to-participate issue that qualifies every R.C. 4123.512 appeal to common pleas court.

{¶ 43} "[T]he courtroom in Anglo–American jurisprudence is more than a location with seats for a judge, jury, witnesses, defendant, prosecutor, defense counsel and public observers; the setting that the courtroom provides is itself an important element in the constitutional conception of trial, contributing a dignity essential to 'the integrity of the trial' process. *Craig v. Harney* [1947], 331 U.S. 367, 377 [67 S.Ct. 1249, 91 L.Ed. 1546]. As MR. JUSTICE BLACK said, in another context: 'The very purpose of a court system is to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.'" *Estes v. Texas* (1965), 381 U.S. 532, 561, 85 S.Ct. 1628, 14 L.Ed.2d 543 (Warren, C.J., concurring), quoting *Cox v. Louisiana* (1965), 379 U.S. 559, 583, 85 S.Ct. 476, 13 L.Ed.2d 487 (Black, J., dissenting).

{¶ 44} " 'Trial by jury,' in the primary and usual sense of the term at the common law and in the American constitutions, is not merely a trial by a jury of twelve men before an officer vested with authority to cause them to be summoned and empanelled, to administer oaths to them and to the constable in charge, and to enter judgment and issue execution on their verdict; but it is a trial by a jury of twelve men, in the presence and under the superintendence of a judge empowered to instruct them on the law and to advise them on the facts, and (except on acquittal of a criminal charge) to set aside their verdict if in his opinion it is against the law or the evidence. * * *

{¶ 45} "Lord Hale, in his History of the Common Law, c. 12, 'touching trial by jury,' says: 'Another excellency of this trial is this, that the judge is always present at the time of the evidence given in it.'" *Capital Traction Co. v. Hof* (1899), 174 U.S. 1, 13–14, 19 S.Ct. 580, 43 L.Ed. 873.

{¶ 46} To the same effect, this court has recognized for over 150 years that "a jury, properly speaking, is an appendage of a court, a tribunal auxiliary to the administration of justice in a court, that a presiding law tribunal is implied, and that the conjunction of the two is the peculiar and valuable feature of the jury trial * * *." *Lamb v. Lane* (1854), 4 Ohio St. 167, 179.

{¶ 47} This constellation of operative relationships that inheres in the centralized live trial belies any suggestion that trial by videotape is simply a new and more efficient technique for presenting evidence. The jury trial in American jurisprudence "is an extremely complex network of communications which, in large measure, depend for their existence on the very simultaneity in time and space which videotape is designed to transcend. Thus, the introduction of videotape into the trial proceeding disturbs a great many interdependent communications relationships—relationships which have evolved from social values, historical traditions and constitutional protections. These social values, historical traditions and constitutional protections define parameters for compatibility for the use of videotape in the judicial process." Doret, Trial by Videotape—Can Justice Be Seen to Be Done? (1974), 47 Temple L.Q. 228, 267.

{¶ 48} This is not to suggest that the use of videotape trials should be summarily rejected or that Civ.R. 40 or Sup.R. 13(B) is facially invalid. But the nature and extent of authority bestowed upon the trial judge under these rules must be defined with respect to the essential elements of the trial process, which include the facilitation of accurate fact-finding, the elicitation of truth, the exposure of falsehood, and the preservation of public confidence in our judicial system. "Thus, in determining the intent behind Civ.R. 40 and C.P.Sup.R. 12(B) [now Sup.R. 13(B) ], the state and federal Constitutions are an indication as to the permissible procedure to be used by a trial court." *Fantozzi v. Sandusky Cement Prods. Co.* (1992), 64 Ohio St.3d 601, 608–609, 597 N.E.2d 474. Otherwise, the perceived economy of modern technology may soon come to displace our sense of justice.

{¶ 49} The majority attempts to assuage such fears by cautioning that "in the great majority of cases, even those not presenting discrete factual or legal issues, the preferred practice remains to permit all parties—and particularly plaintiffs—the right to testify live before a jury when the party so requests." But the majority's decision and analysis belie its own caveat. Aside from the magnitude of the order in this case, the majority has set the stage for a series of successive countywide decrees of similar nature and scope and thus for a statewide practice that requires all workers' compensation claimants who seek to participate in the fund for an asbestos-related occupational disease to try their cases in common pleas court by way of prerecorded videotape. And in doing so, the majority conducts an entirely uncritical, one-sided analysis in which appellant's position is reduced to the right of a prisoner to be present at his or her civil trial in "three dimensions" and only the perceived advantages of trial by videotape are considered.

{¶ 50} The majority's analysis begins with the statement that the jury right in this case is statutory, not constitutional, "and therefore may be constrained."

But nothing in the statute purports to constrain that right. R.C. 4123.512 simply confers a right to trial by jury without qualification. Nor do the rules portend any variation of their standards of applicability depending on the source of a jury right.

{¶ 51} The majority then relies on *Bustillo v. Hilliard* (C.A.7, 2001), 16 Fed.Appx. 494, 2001 WL 894274, for the proposition that the right to trial by jury does not include "an unqualified right to participate in a trial live rather than by videotape" or "entitle Arrington to give his testimony in three dimensions." In so doing, the majority reduces all the essential elements of a jury trial to the conditional right of a prisoner to be physically present at the trial of his or her civil claims.

{¶ 52} The appellant in *Bustillo* was a federal prisoner. At the time of his trial against the former manager of the control unit at the federal prison in Marion, Illinois, Bustillo was housed in a federal prison in Florence, Colorado, "which replaced Marion as the place where the nation's most violent and incorrigible inmates are confined." He was "serving life without possibility of parole for murder, attempted murder, and additional violent crimes committed while in less-secure prisons." He was required to remain in prison and participate in his civil trial in East St. Louis by videoconferencing because "[t]he chances of escape and mayhem were minimized by ensuring that he stayed put during trial." Id. at 495, 2001 WL 894274 at *1.

{¶ 53} As the court explained, "Nothing in the Constitution or the federal rules gives a prisoner entitlement to that extra dimension [of physical presence], if for good reasons the district judge concludes that trial can be conducted without it." Id. James Arrington, however, is not a prisoner. He has not forfeited any rights or protections under the law by virtue of being incarcerated, because he is not incarcerated. And there is no concern that he might escape, because he is not confined.

{¶ 54} More important, the trial in *Bustillo* was conducted live, not by prerecorded videotape. It was held in a courtroom before a jury and in the presence of a presiding judge, all of whom saw and heard the evidence as it was presented. Only Bustillo and some of his witnesses were required to participate by video link. Thus, the court explained, "Bustillo participated in the trial; he testified, presented evidence, examined adverse witnesses, looked each juror in the eye, and so on. Jurors saw him (and he, them) in two dimensions rather than three." Id. at 495, 2001 WL 894274 at *1.

{¶ 55} Arrington is claiming not that he was denied a right to be physically present at a live trial but that he was denied a live trial in the first place. By its inconsistent uses of the term "live" to describe both Bustillo's physical presence at trial and the nature of the historical jury trial, the majority manages to

conflate two distinct aspects of the right with correspondingly distinct considerations.

{¶ 56} The majority continues nonetheless to find that "Arrington's complaints of prejudice from being confined to two dimensions are speculative. Given that his refusal to record evidence led to the dismissal of the case before the presentation of any evidence, his claim of prejudice is purely theoretical."

{¶ 57} But the whole point of the rules is to ensure that a videotape trial is ordered only "in an appropriate case." Sup.R. 13(B)(2). Accordingly, a determination as to whether the parties will be prejudiced by a videotape trial must be made *before the order is entered.* It is reversible error for a trial court to order a prerecorded videotape trial without first determining that there are compelling reasons for doing so "and that no cognizable prejudice will be suffered by the parties." *Fantozzi,* supra, 64 Ohio St.3d at 609, 597 N.E.2d 474. Thus, Arrington's claim of prejudice cannot be found to be "speculative" or "theoretical" merely because "his refusal to record evidence led to the dismissal of the case before the presentation of any evidence."

{¶ 58} The most revealing aspect of the majority's analysis, however, lies in its attempt to find some support for the trial court's wholesale application of the rules to an entire class of workers' compensation cases. According to the majority, "[t]he trial court's decision to conduct trial by video is unusual in its scope, but it is not beyond the pale of orders by other courts in other cases or beyond the boundaries of our prior case law." Relying on *Fantozzi* and *State v. Moffitt* (1975), 133 Vt. 366, 340 A.2d 39, the majority concludes that "[t]he trial court's order here was thus not one without support in the law." Nothing could be further from the truth.

{¶ 59} *Fantozzi* involved an order to videotape a single trial. The case did in fact proceed to trial by videotape, which lasted several days, and the jury returned a verdict in favor of the plaintiff. We vacated the judgment and remanded the cause for a new trial, finding that the trial court had failed to reflect in a journal entry that it considered the factors set forth in former C.P.Sup.R. 12(B)(2). Id. at 610, 597 N.E.2d 474. Thus, we never decided in *Fantozzi* that even that single case was "an appropriate case" for videotaping.

{¶ 60} We did, however, discuss the considerations that must precede a videotape-trial order:

{¶ 61} "[Former] C.P.Sup.R. 12(B)(2) provides in pertinent part: 'In determining whether to order a videotape trial, the trial judge, after consultation with counsel, *shall* consider the costs involved, the nature of the action and the nature and amount of testimony.' (Emphasis added.) The word 'shall' is mandatory rather than directory and requires the court to consider the factors after consultation with counsel. This interpretation of the rule is proper in light of the

state and federal constitutional significance which we recognize is placed upon the right to a trial by jury.

{¶ 62} "Accordingly, it is reversible error for a trial court to order a prerecorded videotape trial over the objection of all parties in an action unless the court reflects in a journal entry that it has, pursuant to C.P.Sup.R. 12(B), consulted with the attorneys for the parties and considered the costs involved, the nature of the action and the nature and amount of testimony, that these factors taken together indicate a compelling reason to conduct the trial by videotape and that no cognizable prejudice will be suffered by the parties. * * * The reviewing court should also consider any other factors that may have induced the trial court to order videotaping, with the underlying premise being that the trial court, under such circumstances, should be extremely cautious in entering such an order." (Citations omitted.) Id. at 609, 597 N.E.2d 474.

{¶ 63} *Fantozzi* therefore requires a case-specific finding of necessity while providing safeguards against the indiscriminate use of the rules. How the majority can conclude that a sweeping decision to mandate prerecorded videotape trials in over 400 asbestos-related workers' compensation cases lies within the boundaries of our prior case law is beyond comprehension.

{¶ 64} The majority's reliance on *Moffitt,* 133 Vt. 366, 340 A.2d 39, is equally unavailing. Not only did *Moffitt* involve the videotaping of just one driving-under-the-influence trial, but the parties in that case, along with their counsel, stipulated in advance of trial that the testimony of all witnesses would be presented to the jury by videotape. It was only after the cause was tried by videotape and the defendant was convicted that he decided on appeal to challenge the procedure as inherently unfair. The court ultimately concluded that "there is nothing inherently prejudicial in videotaping witness testimony for trial purposes *where, as here, the defendant has consented thereto* and the dictates of proper courtroom procedure have been followed." (Emphasis added.) Id. at 370, 340 A.2d 39.

{¶ 65} The majority has therefore been unable to identify any decision from any appellate court in which even a single case was found to be an appropriate case for ordering a prerecorded videotape trial over the objection of a party.

{¶ 66} The majority also relies on certain law review articles to support its broad interpretation of the rules. In so doing, however, the majority presents an incomplete picture of the literature. It touts what some commentators perceive to be the advantages of videotaped evidence, but ignores a host of important questions and valid concerns that have been raised in regard to its large-scale use. It makes only terse references to these concerns as Arrington's "complaints" or "claims of prejudice," each time dismissing them out of hand as "speculative," "theoretical," "generic," or "amorphous."

{¶ 67} For example, the majority mentions some of the more favorable results of certain studies that were conducted to gauge the reactions of jurors to actual videotrials that were held in Ohio and California in 1973. In so doing, the majority relies on an article by Diane M. Hartmus, Videotrials (1996), 23 Ohio N.L.Rev. 1, which sets forth the jurors' impressions of videotaped evidence as reported by the researchers who conducted the studies but not the researchers' concerns about the potential implications of its extended use. Id. at 9–10, 340 A.2d 39.

{¶ 68} In their own article, however, the researchers were careful to point out that while the jurors' responses were generally favorable to videotaped evidence, some important questions remained unanswered. They explained, in particular, that "[p]erhaps the most fundamental issue is the differential impact, if any, of live versus videotaped trial testimony upon jury decision making. Time and again in the jurors' responses there appears a more or less explicit belief that there is a difference in the outcome of a trial decisionmaking process produced by live versus taped testimony." Bermant, Chappell, Crockett, Jacoubovitch, and McGuire, Juror Responses to Prerecorded Videotape Trial Presentations in California and Ohio (1975), 26 Hastings L.J. 975, 994.

{¶ 69} Accordingly, two authors of Juror Responses explained in a companion article:

{¶ 70} "Underlying the position set forth by the proponents of PRVTT [prerecorded videotape trials] rests an unexamined assumption, namely that the use of the medium represents a simple substitution in the means of transmitting information. For example, Guy Kornblum [Videotape in Civil Cases (1972), 24 Hastings L.J. 9, 15] states that '[v]ideotaped material is merely a new method of presenting evidence.' In this view, the essential features of evidence are assumed to remain invariant under changes in the means by which the evidence is presented. But this uncritical assumption about the direct substitutability of media is generally untenable. Whether it holds for PRVTT, or even for less complete uses of videotape, must be demonstrated." Bermant and Jacoubovitch, Fish Out of Water: A Brief Overview of Social and Psychological Concerns About Videotaped Trials (1975), 26 Hastings L.J. 999, 1000–1001.

{¶ 71} One problem arises from the fact that the video camera is innately selective. "Because the camera becomes the juror's eye on the participants, it locks the juror's perspective in important ways: the jurors are no longer free to look around the setting of the trial and determine their own priorities for assessing what is relevant and what is not. Videotaping is, therefore, an unavoidably inscoping, manipulative translation of the live confrontational situation." Id. at 1001.

{¶ 72} Another problem lies in the fact that some of the touted benefits of prerecorded videotape trials may actually contain their greatest disadvantages. Or stated differently, some of the supposed weaknesses of live trials may well embody their greatest strengths. For example, the majority contends that the editing out of improper questions and inadmissible testimony constitutes a primary advantage of videotrials over live trials. Yet this is hardly a foregone conclusion.

{¶ 73} "Objections and the striking of inadmissible evidence engender an appreciation by jury and spectators that not all information is legitimate for purposes of legal fact-finding, and that the judge presides to insure that the rules of fair play are followed. The sustaining of an objection, the reprimand of a witness or an attorney by the judge, and in general all the procedural work that PRVTT proponents would put backstage, instruct the laymen on the differences between everyday resolution of disputes and the formal procedures by which trial proceedings are governed. The metamessage—'Not everything goes here—we have a set of rules that prescribe proper conduct and they will be followed,'—may be lost in a seamlessly edited videotape shown in a courtroom from which the judge, attorneys, plaintiff, defendant, and witnesses are absent. Observation of confrontations stemming from errors may be an important instructional device for those unfamiliar with the judicial process.

{¶ 74} "A similar point may apply in the case of interruptions and delays of various sorts that would be eliminated or minimized by PRVTT. While aggravating and wasteful of precious court time, they nevertheless carry the metamessage: 'We will not cut our procedures short for the sake of efficiency or expediency. This is the most deliberate process in our social structure, and we will not betray it—we have time to be fair.' Of course this may be only one of many implicit messages in protracted proceedings. But the value of this metamessage and the cost of forgoing it for a presentation that is pre-timed to the split second have yet to be ascertained." Id. at 1008–1009.

{¶ 75} The majority also lists as one of the perceived advantages to videotaped evidence the "reduction in the potential for mistrial, including unintentional judicial influence on the jury." ¶ 35. The problem, however, is that videotrials do not just remove the potential for improper judicial influence on the jury—they remove the judge. As a result, they remove "one of the most immediate disincentives to committing perjury, evading questions, or otherwise not cooperating with the examiner." Trial by Videotape, supra, 47 Temple L.Q. at 251. And since the presence of the judge during questioning "contributes to the veracity of the testimony given by witnesses, loss of judicial presence may sacrifice one of the fundamentals of the judicial process." Id. at 263.

{¶ 76} Nor can the value of live testimony in assessing credibility be doubted. For centuries, the personal appearance of witnesses before a factfinder has been deemed a cornerstone of our judicial process and indispensable to the ascertainment of truth. See *Natl. Labor Relations Bd. v. Dinion Coil Co.* (C.A.2, 1952), 201 F.2d 484, 487–490. "Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words." *Govt. of Virgin Islands v. Aquino* (C.A.3, 1967), 378 F.2d 540, 548.

{¶ 77} As explained by Judge Learned Hand, "the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale." *Dyer v. MacDougall* (C.A.2, 1952), 201 F.2d 265, 268–269. See, also, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273 ("The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony").

{¶ 78} In fact, one of the most ardent supporters of increased court-related use of videotape has been compelled to admit that "videoconferencing is not a neutral medium and that it potentially might manipulate how jurors perceive the demeanor of remote witnesses." Roth, Laissez–Faire Videoconferencing: Remote Witness Testimony and Adversarial Truth (2000), 48 U.C.L.A. L.Rev. 185, 188.

{¶ 79} These are all valid concerns, and they cannot be ignored or dismissed on the basis of the cautious optimism that has been generated by the preliminary results of a few limited studies conducted over 30 years ago. Like the case law and the rules themselves, the literature suggests that we proceed with extreme caution in sanctioning the increased use of prerecorded videotape trials, especially when they are compulsory. There is nothing in the law, or in our experience, that supports this sudden leap to mass videotrials.

{¶ 80} For these reasons, I respectfully dissent.

PFEIFER and O'DONNELL, JJ., concur in the foregoing dissenting opinion.

PFEIFER, J., dissenting.

{¶ 81} I join in Justice Resnick's dissent regarding the use of all-videotape trials. I also dissent because I reject the idea that there ought to be a dichotomy in jury-trial rights between litigants bringing causes of action that existed at the time of the adoption of the Ohio Constitution and litigants whose causes of action were recognized after that time. Section 5, Article I of the Ohio Constitution provides:

{¶ 82} "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

{¶ 83} The only limitation that the Constitution puts on the right to a jury trial is the number of jurors necessary to decide a civil case. The Constitution does not limit the right to have a matter tried before a jury to causes of action existing at the time of the ratification of the Constitution. We do not make artificial distinctions as to juries in criminal matters based upon whether the crimes with which the defendant is charged existed at the time of the crafting of the Constitution. We should not make such distinctions in civil matters, either.

{¶ 84} Did the framers really intend a two-tiered system of civil justice? Were they so shortsighted as to think that the common law would suddenly stop the evolution it had been making since the Magna Carta? Can Ohioans alleging wrongful termination, discrimination, intentional infliction of emotional distress, or filial consortium claims have their jury trial rights extinguished, since those causes of action did not exist at common law at the time the Constitution was written?

{¶ 85} The limitation of the jury trial right is not a creature of our Constitution, but instead emerged from this court's case law. The flimsy decisions upon which is built the jurisprudence limiting jury trial rights are *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, and *Brown v. Reed* (1897), 56 Ohio St. 264, 46 N.E. 982. Neither deals with a traditional civil matter. *Belding* arose from a bastardy proceeding, wherein the defendant was ordered to pay to the mother of his child a " '*sum * * * necessary for her support, maintenance and necessary expenses, caused by pregnancy and childbirth together with the costs of prosecution.*' " (Emphasis sic.) *Belding*, 121 Ohio St. at 394, 169 N.E. 301, quoting G.C. 12123. The court held that the father did not have a right to a jury trial in that case, since "[t]hat [constitutional] guaranty only preserves the right of trial by jury in cases where under the principles of the common law it existed previously to the adoption of the Constitution." Id. at 396, 169 N.E. 301. The court saw a bastardy proceeding as a "special proceeding[ ] for the enforcement of a moral duty," along the lines of an alimony proceeding. Id. at 397, 169

N.E. 301. The court noted that an alimony proceeding "is not a civil action." Id. at 398, 169 N.E. 301.

{¶ 86} *Brown* was a probate court matter involving an executor that had committed malfeasance in the sale of land. The court held that "[b]oth before and since the adoption of the constitution it has been usual to call executors and other trustees to account in courts having equity or probate jurisdiction, and without the intervention of a jury to determine any question affecting the state of their accounts." *Brown,* 56 Ohio St. at 270, 46 N.E. 982.

{¶ 87} Whether or not *Belding* and *Brown* correctly decided the applicability of jury trial rights in those cases, they dealt with a very narrow category of causes of action. In the case at bar, we are not dealing with a bastardy proceeding or any other proceeding to enforce a moral duty; nor did this matter arise in probate court. It is a civil cause brought in a court of general jurisdiction. That broad category of cases enjoyed the jury-trial right before ratification of the Constitution. Moreover, the General Assembly recognizes the role of a jury in an R.C. 4123.512 proceeding. Can we truly interpret the Constitution to mean that the right to a jury trial is *not* inviolate in cases where that right is specifically recognized by the General Assembly?

{¶ 88} I would hold that the plaintiff in this case has a fundamental right to a jury trial.

O'DONNELL, J., concurs in the foregoing dissenting opinion.

———————

Kelley & Ferraro, L.L.P., Michael V. Kelley, and Thomas M. Wilson, for appellant.

Buckingham, Doolittle & Burroughs, L.L.P., George H. Rosin, and David W. Hilkert, for appellee DaimlerChrysler Corporation.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, Stephen P. Carney, Senior Deputy Solicitor, Elise Porter, Assistant Solicitor, Vincent T. Lombardo, and James A Barnes, Assistant Attorneys General, for appellee William E. Mabe, Administrator of Workers' Compensation.