THE STATE EX REL. GROSS, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLEE; FOOD, FOLKS & FUN, INC., D.B.A. KFC, APPELLANT.

[Cite as *State ex rel. Gross v. Indus. Comm.,*
115 Ohio St.3d 249, 2007-Ohio-4916.]

(No. 2005–1689—Submitted May 2, 2007—Decided September 27, 2007.)

LUNDBERG STRATTON, J.

{¶ 1} This matter is before us on a motion for reconsideration filed by appellee David M. Gross. Gross's request for reconsideration was supported by appellee Industrial Commission of Ohio.[1] Respondent-appellant, Food, Folks & Fun, Inc., d.b.a. KFC, filed a memorandum opposing reconsideration.[2]

{¶ 2} We ordered oral argument on the limited issue of whether we should grant the motion for reconsideration and ordered that each party may file a brief on the issue.

{¶ 3} For the reasons that follow, we grant Gross's motion, vacate our decision in *State ex rel. Gross v. Indus. Comm.,* 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335 ("*Gross I* "), and affirm the judgment of the court of appeals, which

---

1. Amici curiae Ohio AFL–CIO, Ohio State Building and Construction Trades Council, the Ohio Academy of Trial Lawyers, United Auto, Aerospace & Agricultural Implement Workers of America, and the Fraternal Order of Police of Ohio, Inc. supported Gross's request for reconsideration.

2. Amici curiae Ohio Chamber of Commerce, the Ohio Self–Insurers Association, the Ohio Chapter of the National Federation of Independent Business, Ohio Manufacturers Association, and the Ohio Council of Retail Merchants filed a memorandum opposing reconsideration.

granted a writ of mandamus ordering the Industrial Commission to reinstate Gross's temporary total disability ("TTD") benefits.

## *Gross I*

{¶ 4} In *State ex rel. Gross v. Indus. Comm.*, 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, we upheld the commission's termination of TTD compensation to Gross for injuries he sustained in the course of and arising out of his employment with KFC. Gross had injured himself and two others on November 26, 2003, when he placed water in a pressurized deep fryer, heated the fryer, and opened the lid. KFC conducted an investigation into the accident and determined that Gross had violated a workplace safety rule and repeated verbal warnings. KFC terminated his employment on February 13, 2004. As a result, the Industrial Commission terminated Gross's TTD benefits on the basis that he had voluntarily abandoned his employment.

{¶ 5} In *Gross I*, the majority determined that KFC terminated Gross for disobeying written safety rules and ignoring repeated warnings. Therefore, the court held, the conduct for which he was fired constituted a voluntary abandonment of employment that precluded continuation of his TTD compensation.

{¶ 6} Gross contends that our opinion in *Gross I* wrongfully injected fault into the workers' compensation system and expanded the voluntary-abandonment doctrine.

## Statutory Basis of Compensation for Temporary Total Disability

{¶ 7} Workers' compensation law provides that an employee who is injured in the course of employment is entitled to receive "compensation for loss sustained on account of the injury." R.C. 4123.54(A). An employee who is temporarily and totally disabled as a result of a workplace injury may be entitled to compensation for lost earnings during the period of disability while the injury heals. *State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, 517 N.E.2d 533. Generally, TTD benefits terminate when the employee returns to work, is capable of returning to work, or has reached maximum medical improvement. R.C. 4123.56.

## Voluntary–Abandonment Doctrine

{¶ 8} In *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.* (1985), 29 Ohio App.3d 145, 29 OBR 162, 504 N.E.2d 451, the Tenth District Court of Appeals was asked to determine whether a claimant was entitled to the continuation of his TTD benefits after he permanently retired from the work force. The appellate court applied a two-part analysis to determine whether an injury qualified for TTD compensation. The *Jones* court first focused upon the disabling aspects of the injury that prevented the claimant from returning to his former

position of employment. The court next inquired whether there was any reason other than the injury that was preventing the claimant from returning to work. Id. at 147, 29 OBR 162, 504 N.E.2d 451. This reflected the underlying purpose of TTD compensation, i.e., to compensate an employee for the loss of earnings while the industrial injury heals.

{¶ 9} *Jones* concluded that a claimant's voluntary retirement with no intention of returning to the work force would be reason to terminate TTD benefits because his disability would no longer be the cause of his loss of earnings. The court held that "where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued temporary total disability benefits since it is his own action, rather than the industrial injury, which prevents his returning to such former position of employment." Id., 29 Ohio App.3d at 147, 29 OBR 162, 504 N.E.2d 451.

{¶ 10} In *State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, 517 N.E.2d 533, this court applied the underlying principle of *Jones* to a claimant who was in prison. While incarcerated, Nelson Ashcraft filed a motion for TTD compensation related to an industrial injury he sustained three years earlier. The commission denied his request on the ground that his incarceration amounted to an abandonment of his former position of employment.

{¶ 11} Ashcraft argued that, unlike the claimant in *Jones,* his incarceration was not a permanent abandonment of the work force and it could not be regarded as voluntary. The temporary nature of his abandonment of his former employment was irrelevant, the court held. Furthermore, a person who violates the law is presumed to tacitly accept the consequences of his voluntary acts so there is a voluntary nature to incarceration. The claimant was no longer in a position to return to work while incarcerated. His loss of earnings was no longer "on account of the injury" as required by R.C. 4123.54. Therefore, the court held that he had voluntarily removed himself from the work force and was not eligible for TTD benefits.

{¶ 12} Since *Ashcraft,* we have continued to apply the voluntary-abandonment doctrine to situations in which the claimant has left his former position of employment *following* his injury. In *Rockwell Internatl. v. Indus. Comm.* (1988), 40 Ohio St.3d 44, 531 N.E.2d 678, we clarified that the abandonment of employment must be voluntary, not involuntary, to act as a bar to TTD compensation. In *Rockwell,* the claimant had retired while on disability. There was some evidence, however, that his retirement was causally related to his industrial injury. Therefore, we upheld the commission's determination that the claimant's retirement was not voluntary and he continued to be eligible for TTD benefits. "We find that a proper analysis must look beyond the mere volitional nature of a

claimant's departure. The analysis must also consider the reason underlying the claimant's decision to retire. We hold that where a claimant's retirement is causally related to his injury, the retirement is not 'voluntary' so as to preclude eligibility for temporary total disability compensation." Id. at 46, 531 N.E.2d 678.

{¶ 13} In *State ex rel. Louisiana–Pacific Corp. v. Indus. Comm.* (1995), 72 Ohio St.3d 401, 650 N.E.2d 469, we were asked to determine whether an employee's termination for violating work rules could be construed as a voluntary abandonment of employment that would bar TTD compensation. In that case, the employer was notified that the claimant was medically released to return to work following a period of TTD. When the claimant did not report to work for three consecutive days, he was automatically terminated for violation of the absentee policy in the company's employee handbook.

{¶ 14} The claimant subsequently moved for additional TTD benefits, arguing that being fired was an involuntary departure from employment. " 'Although not generally consented to, discharge, like incarceration, is often a consequence of behavior that the claimant willingly undertook, and may thus take on a voluntary character.' " *Louisiana–Pacific,* 72 Ohio St.3d at 403, 650 N.E.2d 469, quoting *State ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 121, 623 N.E.2d 1202. "[W]e find it difficult to characterize as 'involuntary' a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee." Id. We explained that a departure under such circumstances must be considered voluntary because "an employee must be presumed to intend the consequences of his or her voluntary acts." Id.

{¶ 15} Since *Rockwell,* we have reviewed various types of job terminations in terms of "voluntary" or "involuntary": retirement, layoff, firing, incarceration, and resignation, and cases in which the claimant was seeking TTD compensation when working at a job other than the one at which the injury occurred. In *State ex rel. McCoy v. Dedicated Transport, Inc.,* 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51, we examined the evolution of the voluntary-abandonment doctrine as a bar to TTD compensation. Our analysis in *McCoy* is instructive: To be eligible for TTD compensation, "the claimant must show not only that he or she lacks the medical capability of returning to the former position of employment but that a cause-and-effect relationship exists between the industrial injury and an actual loss of earnings. In other words, it must appear that, but for the industrial injury, the claimant would be gainfully employed." Id. at ¶ 35.

{¶ 16} "[T]he voluntary abandonment rule is potentially implicated whenever TTD compensation is requested by a claimant who is no longer employed in the position that he or she held when the injury occurred. But characterizing the

claimant's departure from the former position of employment as 'voluntary' does not automatically determine the claimant's eligibility for TTD compensation. Instead, voluntary departure from the former position can preclude eligibility for TTD compensation only so long as it operates to sever the causal connection between the claimant's industrial injury and the claimant's actual wage loss." Id. at ¶ 38.

{¶ 17} In this case, the commission deemed Gross's discharge to be voluntary and terminated his TTD benefits. In the court of appeals, the magistrate strictly applied the *Louisiana–Pacific* analysis and likewise recommended denial of relief to Gross. However, the appellate court concluded that the employer's termination letter expressly connected the employer's decision to terminate with the accident. Thus, the court concluded that his "termination was causally related to his injury" and his departure was involuntary. *State ex rel. Gross v. Indus. Comm.*, Franklin App. No. 04AP–756, 2005-Ohio-3936, 2005 WL 1806457, ¶ 11.

{¶ 18} Nevertheless, *Gross I* narrowly focused on Gross's willful violation of work rules justifying his discharge. The parties have perceived our language in *Gross I* as an expansion of the voluntary-abandonment doctrine and a potential encroachment upon the no-fault nature of our workers' compensation laws. Because of the confusion and misunderstanding that *Gross I* has generated, it is necessary for us to address the issues raised in Gross's motion for reconsideration.

{¶ 19} First, *Gross I* was not intended to expand the voluntary-abandonment doctrine. Until the present case, the voluntary-abandonment doctrine has been applied only in postinjury circumstances in which the claimant, by his or her own volition, severed the causal connection between the injury and loss of earnings that justified his or her TTD benefits. *State ex rel. Nick Strimbu, Inc. v. Indus. Comm.*, 106 Ohio St.3d 173, 2005-Ohio-4386, 833 N.E.2d 286; *State ex rel. Hammer v. Indus. Comm.*, 99 Ohio St.3d 334, 2003-Ohio-3960, 792 N.E.2d 184; *State ex rel. Daniels v. Indus. Comm.*, 99 Ohio St.3d 282, 2003-Ohio-3626, 791 N.E.2d 440; *State ex rel. Ohio Treatment Alliance v. Paasewe*, 99 Ohio St.3d 18, 2003-Ohio-2449, 788 N.E.2d 1035; *State ex rel. McClain v. Indus. Comm.* (2000), 89 Ohio St.3d 407, 732 N.E.2d 383; *State ex rel. Smith v. Superior's Brand Meats, Inc.* (1996), 76 Ohio St.3d 408, 667 N.E.2d 1217. The doctrine has never been applied to preinjury conduct or conduct contemporaneous with the injury. *Gross I* did not intend to create such an exception.

{¶ 20} The General Assembly, in its expression of public policy, has enacted certain exceptions to a claimant's eligibility for benefits. For instance, R.C. 4123.54(I) expressly prohibits a claimant from receiving benefits while incarcerated. In addition, the statute creates a rebuttable presumption that a claimant's being intoxicated or under the influence of drugs is the proximate cause of an

injury, R.C. 4123.54(B), which forfeits the employee's eligibility for benefits, R.C. 4123.54(A). However, the statute contains no exception for willful or deliberate violation of workplace rules. It is the role of the legislature, not the judiciary, to carve out exceptions to a claimant's eligibility for TTD compensation.

{¶ 21} Second, it was not our intention in *Gross I* to inject fault into the analysis of voluntary abandonment or to otherwise undermine the no-fault nature of our workers' compensation system. To the extent that our opinion in *Gross I* has been interpreted as injecting fault into the system, we expressly reject that interpretation.

### Conclusion

{¶ 22} The no-fault nature of our workers' compensation scheme is a statutory mandate. R.C. 4123.01(C) defines "injury" without qualification so long as it arises out of the course of employment. Except as expressly set out in the statute, workers' compensation benefits may not be denied on the basis of fault to a claimant who was injured in the course and scope of employment. R.C. 4123.54(A); *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 110, 522 N.E.2d 489.

{¶ 23} There is no question that Gross sustained a disabling injury. The issue is whether his injury or his termination (because of the violation of a rule) is the cause of his loss of earnings. The distinctions between voluntary and involuntary departure are complicated and fact-intensive. An underlying principle, however, is that if an employee's departure from the workplace "is causally related to his injury," it is not voluntary and should not preclude the employee's eligibility for TTD compensation. *State ex rel. Rockwell*, 40 Ohio St.3d at 46, 531 N.E.2d 678; *State ex rel. McCoy v. Dedicated Transport, Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51. The Tenth District Court of Appeals followed that principle. The court concluded from KFC's termination letter that "relator's termination was causally related to his injury. The letter states expressly that the employer's actions arose from 'the accident' that caused relator's injury." *State ex rel. Gross*, 2005-Ohio-3936, 2005 WL 1806457, ¶ 11.

{¶ 24} We agree. Although KFC appears justified in firing Gross for violating workplace rules, the termination letter established that his discharge was related to his industrial injury. Gross had violated the same rules on prior occasions without repercussion. However, according to the termination letter, it was Gross's latest violation resulting in injury that triggered KFC's investigation and subsequent termination.

{¶ 25} Therefore, upon reconsideration, we hold that Gross's termination was involuntary. Any reference to deliberate, willful, or wanton behavior in *Gross I* was intended to describe his behavior that violated work rules and that provided

grounds for his termination. That language was not intended to set a new standard for voluntary abandonment.

{¶ 26} Consequently, we grant Gross's motion, vacate our decision in *State ex rel. Gross v. Indus. Comm.*, 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, and affirm the judgment of the court of appeals, which ordered the Industrial Commission to reinstate Gross's TTD benefits.

Judgment accordingly.

MOYER, C.J., and PFEIFER, O'DONNELL, and CUPP, JJ., concur.

O'CONNOR and LANZINGER, JJ., dissent.

---

**PFEIFER, J., concurring.**

{¶ 27} The Chicken Littles in dissent predict a workplace apocalypse, where employees bob for drumsticks in hot oil, ultimately resulting in an increase in the price of a bucket of "extra crispy." Back in the real world, nothing has changed, due to this court's wise rethinking of its previous decision in this case. Here, Gross was injured on the job. That he should receive workers' compensation benefits for his injury is completely consistent with the philosophical underpinnings of the workers' compensation system. The lead dissent is full of citations and fury signifying nothing—of the many cases cited in the dissent, not one comes anywhere close to even tangentially involving a worker being fired and denied workers' compensation benefits for a violation of workplace rules that caused his own injury.

{¶ 28} The lead dissent invites a system in which workers who make poor decisions (removing a guard, working on a roof without scaffolding, overriding a control on a punch press) can end up being denied benefits. That dissent's Dickensian dreamworld—where presumably the Union workhouse, the Treadmill, and the Poor Law remain in full vigour—does not exist. We enjoy instead a constitutionally established system that renders fault irrelevant in compensating employees for their workplace injuries.

---

**O'CONNOR, J., dissenting.**

{¶ 29} In a per curiam opinion released at the close of the 2006 court term, we addressed a simple, straightforward question: "Did the Industrial Commission abuse its discretion in finding that an employee voluntarily abandoned his employment, thus disqualifying himself from compensation for temporary total

disability?" *State ex rel. Gross v. Indus. Comm.*, 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, ¶ 1 (*"Gross I "*).

{¶ 30} A clear majority of this court rendered an opinion with a similarly straightforward answer: no.

{¶ 31} The employee moved the court for reconsideration in response to our decision, a common but usually unsuccessful request by parties who do not prevail in their arguments before us. Nevertheless, in this case, we took the unusual step of agreeing to hear oral arguments solely on whether we should grant the motion for reconsideration. 113 Ohio St.3d 1420, 2007-Ohio-1280, 863 N.E.2d 175 ("It is ordered by the court, sua sponte, that oral argument shall be heard * * * and that argument shall be confined to the issue of whether the court should grant appellee's motion for reconsideration").

{¶ 32} After hearing those arguments and reviewing the supplemental briefing of the parties, a new majority of the court now determines not only that reconsideration is warranted but that we should vacate our prior decision and substitute one that reaches a different outcome. In reaching that conclusion, however, *this* majority's opinion is based neither on straightforward application of existing legal authority nor on simple public policy.

{¶ 33} In an effort to present a more palatable decision without expressly overruling our precedent (including our evidently short-lived decision in this case), the majority goes to great lengths. It obfuscates the facts of this case and our holding in *Gross I*. It ignores the abuse-of-discretion standard. In so doing, the majority steps well beyond the bench to proclaim a new exception in the law that it suggests is not the result of judicial activism but, rather, of deference to the legislature. I disagree with that characterization and with the majority's analysis and holding in this case. I believe that the majority's decision is fraught with peril for Ohioans in service-oriented and industrial workplaces and that it is unfair to employers who rightfully attempt to enforce safety rules for the well-being of their employees and consumers. I strongly dissent.

## *Gross I*

{¶ 34} Because the majority takes liberties with its representation of our decision in *Gross I,* at the outset I must reiterate portions of it here for the reader less familiar with it.

{¶ 35} In *Gross I,* we concluded that there had been no showing that the commission abused its broad discretion in finding that David Gross voluntarily abandoned his employment by repeatedly disregarding clear warnings that his conduct in operating workplace equipment was endangering himself and others. The commission's findings, which we are bound to accept, see, e.g., *State ex rel. McClain v. Indus. Comm.* (2000), 89 Ohio St.3d 407, 408, 732 N.E.2d 383 ("The

commission alone is responsible for evaluating evidentiary weight and credibility"), were summarized in *Gross I*:

{¶ 36} "During his orientation, [Gross] was given an employee handbook. One of the safety rules in the handbook stated:

{¶ 37} " '[The employer] wants to have a safe place for you to work—and safety is an important part of your job. To help prevent accidents—follow these safety tips:

{¶ 38} " ' * * *

{¶ 39} " 'Follow all warnings and instructions about the safe operation of all equipment. *Never boil* water in a cooker to clean it.' (Emphasis sic.)" *Gross I,* 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, at ¶ 2–5.

{¶ 40} The commission also found that the handbook set forth "critical violations," i.e., offenses for which employees could be terminated "right away." Id. at ¶ 6–7. One such critical violation was an employee's violation of health or safety guidelines that "cause or could cause illness or injury of anyone." Id. at ¶ 9. There is no dispute that Gross received the handbook. Id. at ¶ 10.

{¶ 41} In addition, there was "[a] warning label affixed to the top of the 690 Henny–Penny gas pressure cooker at Gross's workplace [that] reminded employees that they should 'not close the lid with water or cleaning agents in the cook pot' " but that "[d]espite this warning and the one in the employee handbook, [a supervisor] observed Gross on one occasion putting water into the cooker to clean it. [The supervisor] confronted Gross, explaining the proper cleaning procedure and stressing that adding water to the cooker could cause serious injuries." *Gross I,* 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, at ¶ 11.

{¶ 42} On the day of the injury, a co-worker "saw Gross again putting water into the cooker. [The co-worker] immediately told him to stop and clean it out the proper way. Moments later, a second co-worker warned Gross not to open the cooker's lid, as the now boiling water was under extreme pressure. Gross ignored both men and opened the lid, severely burning himself and [them.]" Id. at ¶ 12.

{¶ 43} In other words, Gross ignored the same important safety warning he had received at least five times in two months of employment: (1) the warning in the employee handbook, (2) the warning of the manufacturer, (3) the warning of his supervisor, and (4 and 5) the two warnings of the co-workers injured by Gross's misconduct. In light of the gravity of Gross's misconduct, our original opinion noted that an immediate termination "may not have been unwarranted." Id., 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, at ¶ 24.

{¶ 44} Nevertheless, Gross's employer did not fire Gross on the spot. Id. Rather, the employer commenced an investigation in which it collected and

reviewed witnesses' statements, the events leading up to the incident, and the incident itself. After concluding its investigation, the employer determined that Gross's employment should be terminated.

{¶ 45} Contrary to the assertions of the court of appeals and the majority here, the employer's termination letter to Gross did not "establish[ ] that his discharge was related to his industrial injury." Majority opinion, ¶ 24. Rather, in the letter terminating his employment, the employer stated that it "cannot and will not tolerate employees who pose a danger to themselves and others based upon their refusal or failure to follow instructions and recognized safety procedures." The employer reiterated Gross's repeated disregard of safety policies and warnings, and noted that those violations of safety policies were identified as "critical violations" for which he knew his employment could be terminated. The letter concluded, "Pursuant to those sections of the Handbook [requiring employees to follow safety rules], and our investigation, your employment * * * is hereby terminated * * *." Thus, the employer's focus was properly on Gross's intentional (not negligent) conduct in repeatedly violating the safety rules for the workplace, *not* on his injury.

{¶ 46} The dissent in *Gross I* conceded that his employer "may have been justified in terminating Gross for misconduct," id., 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, at ¶ 38 (Lundberg Stratton, J., dissenting), and there can be no dispute that the employer had reason to discharge him for his willful violations of safety rules. That fact, i.e., that this case presents a unique factual situation in which it is undisputed that Gross was fired for violation of safety rules that posed a danger to him and to his co-workers, is significant and should inform the majority's analysis. After all, that fact was significant to the commission when it analyzed whether the test for voluntary abandonment that we set forth in *State ex rel. Louisiana–Pacific Corp. v. Indus. Comm.* (1995), 72 Ohio St.3d 401, 403, 650 N.E.2d 469, was satisfied.

{¶ 47} According to the *Louisiana–Pacific* test, the commission assessed whether Gross violated a written work rule that (1) defined clearly the prohibited conduct, (2) had been identified by the employer as an offense for which termination may result, and (3) was known or should have been known by the employee. As we held in *Gross I,* the commission correctly found that *Louisiana–Pacific* was satisfied.

{¶ 48} Indeed, this majority does not contend otherwise. But, as more fully described below, it attempts to evade the result compelled by *Louisiana–Pacific* by creating a new, and quite dangerous, precedent that presents an exception to the rule of *Louisiana–Pacific* that neither this court nor any other has recognized previously. Remarkably, the majority even suggests that its deliberate

departure from established law is not the result of its own activism but, rather, is somehow required by deference to the legislature.

## Gross II

{¶ 49} In its analysis of the commission's application of *Louisiana–Pacific* to the facts of this case, the majority curiously refers to only one source (and, arguably, the most innocuous one) of Gross's knowledge of the safety rule that he twice violated—the employee handbook's provision directing employees to follow all warnings and instructions about the safe operation of equipment and its specific admonishment never to boil water in the fryer. After minimizing the facts, the majority attempts to minimize the application of valid case law and the proper role of the court.

{¶ 50} The majority first leaps to the conclusion that the strict application of *Louisiana–Pacific* in this case is inappropriate because the actions that gave rise to Gross's termination (his deliberate failure to follow safety rules, thereby endangering himself and others) also gave rise to his injury. In the interests of efficiency, I will set to the side the question of whether direct application of a legal standard to the facts of a given case is a strict application, and focus on the majority's conclusion that *Louisiana–Pacific* should not be applied in this case because "the voluntary abandonment doctrine has been applied only in postinjury circumstances in which the claimant, by his or her own volition, severed the causal connection between the injury and loss of earnings that justified his or her TTD benefits." Majority opinion, ¶ 19. I disagree.

{¶ 51} The majority's decision creates an entirely new exception in our workers' compensation law, so that an employee who was discharged for repeatedly violating safety rules can maintain compensation for temporary total disability ("TTD") if he is injured in the process of effectuating his misconduct. That exception is without any support in the law or in public policy.

{¶ 52} The paucity of legal authority is patent. Absolutely nothing in *Louisiana–Pacific* suggests, yet alone requires, that its rule cannot be applied in cases in which the violation of clearly defined, prohibited conduct results in an injury to the employee. Nothing in our past decisions has suggested that the voluntary-abandonment doctrine may be applied only in cases involving postinjury conduct. The new majority cites not a single case or statute from Ohio or elsewhere that suggests such a rule has been recognized. The artificial distinction between an injury that arises before a violation of a safety rule and one that occurs contemporaneously with the violation, or one that arises after the violation has been completed, is a dubious one in the law.

{¶ 53} The majority's generosity in carving out a generous exception in the law for the benefit of this case also lacks support in public policy.

{¶ 54} Workers' compensation coverage is rightfully extended to employees who act unwisely, negligently, or stupidly. See R.C. 4123.01(C), defining injury, and R.C. 4123.54, conferring benefits with no exception for fault. We have adhered to that rule for nearly 100 years, based on the principle that workers' compensation is a "mutual compromise between the interests of the employer and the employee," *Blankenship v. Cincinnati Milacron Chem., Inc.* (1982), 69 Ohio St.2d 608, 614, 23 O.O.3d 504, 433 N.E.2d 572, in which fault plays no part. But the bargain that gives rise to workers' compensation has never extended succor to every employee or the absolute entitlement to TTD that the majority now offers to workers who happen to be injured in the workplace.

{¶ 55} Not a single member of the majority disputes that Gross could have been fired for misconduct. Even though that termination would satisfy the rationale for the voluntary-abandonment doctrine, the majority holds, as a matter of law, that the commission cannot apply the doctrine in this case, simply because Gross happened to be injured as a result of his misconduct. Though that conclusion is troubling, it is not nearly as troubling as the analysis upon which it rests.

{¶ 56} The General Assembly has excluded employees who intentionally inflict injuries on themselves and those whose injuries are caused by alcohol or drug abuse. R.C. 4123.54(A).[3] Such enactments are grounded on common sense, and before today we similarly had the common sense to recognize that employees may exclude themselves from TTD benefit by voluntarily abandoning their jobs. Common sense, however, isn't always so common.

{¶ 57} After recognizing that the legislature enacted the exceptions to eligibility for benefits that are set forth in R.C. 4123.54, the majority asserts that "[i]t is the role of the legislature, not the judiciary, to carve out exceptions to a claimant's eligibility for TTD compensation." ¶ 20, supra. I, too, am aware that this court "is not now, nor has it ever been, a judicial legislature." *Ritchey Produce Co., Inc. v. Ohio Dept. of Adm. Servs.* (1999), 85 Ohio St.3d 194, 206, 707 N.E.2d 871. But if this case rests simply on whether it is for the legislature alone to create exceptions to a worker's eligibility for benefits, then this majority's work is not done. It should engage promptly to overrule our decision in *Louisiana–Pacific* because the voluntary-abandonment doctrine from which this case arises is a *judicially* created exception rather than an exception created by the legislature. The majority, however, makes no effort to apply the *Galatis* analysis here. See *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256.

---

3. It could be argued reasonably that those exceptions to the general rule reflect some legislative awareness of "fault" on the part of the employee, but that does not render the exceptions unconstitutional or improper.

{¶ 58} The court should either follow the law as we have recognized it, or it should overrule it. Instead of doing one or the other, the majority admonishes that exceptions to workers' compensation may arise only from legislative action, but seems quite content to allow some judicially created exceptions to TTD per *Louisiana–Pacific* but not others.

{¶ 59} Moreover, although the new holding in this case is cloaked in purported deference to the legislature, the majority ignores the fact that in the decade that has passed since our decision in *Louisiana–Pacific*, the legislature has not acted or intervened in response to the decision. Nor did the General Assembly respond in the 20 years since we recognized the concept of voluntary abandonment that was first articulated by the court of appeals in *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.* (1985), 29 Ohio App.3d 145, 147, 29 OBR 162, 504 N.E.2d 451.

{¶ 60} We must presume that the legislature knew of our decisions, and thus its silence is notable. After all, there is no doubt that the General Assembly can act strongly, and often does, in response to decisions that it believes were decided wrongly or in which it believes a legislative prerogative was usurped. See, e.g., *Shay v. Shay*, 113 Ohio St.3d 172, 2007-Ohio-1384, 863 N.E.2d 591, ¶ 25; Am.Sub. S.B. No. 20, Section 10, effective Oct. 20, 1994, 145 Ohio Laws, Part I, 204, 238, denouncing *Savoie v. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809; *Fostoria Daily Rev. Co. v. Fostoria Hosp. Assn.* (1988), 40 Ohio St.3d 10, 11, 531 N.E.2d 313; cf. *Yost v. Yost*, Scioto App. No. 02CA2852, 2003-Ohio-3754, 2003 WL 21652172.

{¶ 61} Legislative inaction may well suggest approval of judicial decision, *Lonzrick v. Republic Steel Corp.* (1966), 6 Ohio St.2d 227, 247–248, 35 O.O.2d 404, 218 N.E.2d 185 (Taft, C.J., dissenting). I suggest that one reason for the legislative inaction in this case is that the voluntary-abandonment doctrine, even if judicially created in some sense, is based firmly on statutory principle.

{¶ 62} After noting that under R.C. 4123.56, a temporary total disability is one that prevents a worker from returning to his former position of employment, the court of appeals explained in *Jones & Laughlin* how voluntary abandonment of employment precluded compensation for the temporary disability:

{¶ 63} "A worker is prevented by an industrial injury from returning to his former position of employment where, but for the industrial injury, he would return to such former position of employment. However, where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued temporary total disability benefits since it is his own action, rather than the industrial injury, which prevents his returning to such former position of employ-

ment." *State ex rel. Ashcraft v. Indus. Comm.* (1987), 34 Ohio St.3d 42, 43–44, 517 N.E.2d 533.

{¶ 64} That straightforward understanding should fully apply here, given that it fits fully within the facts of this case and that we have adhered consistently to this concept since *Ashcraft.*

{¶ 65} Our decisions in the voluntary-abandonment cases merely recognize that an employee who is discharged as a consequence of behavior that he willingly undertakes and should have expected to result in discharge may be considered to have voluntarily abandoned his position, *State ex rel. McCoy v. Dedicated Transport, Inc.*, 97 Ohio St.3d 25, 2002-Ohio-5305, 776 N.E.2d 51, ¶ 8; *Louisiana–Pacific*, 72 Ohio St.3d at 403, 650 N.E.2d 469, even if the misbehavior is related to the injury sustained in the workplace, such as when an employee fails to return to work without notice to the employer after being released from medical leave by a physician, *Louisiana–Pacific*, 72 Ohio St.3d at 403, 650 N.E.2d 469.

{¶ 66} I also believe that the General Assembly permitted the voluntary-abandonment doctrine to be developed as a valid exercise of judicial interpretation of the workers' compensation laws because in developing it we did not intrude into policy-making that could increase the costs that Ohio consumers ultimately pay for the costs of the workers' compensation system by expanding its scope. See *Arrington v. DaimlerChrysler Corp.*, 109 Ohio St.3d 539, 2006-Ohio-3257, 849 N.E.2d 1004, ¶ 13, quoting *Bailey v. Republic Engineered Steels, Inc.* (2001), 91 Ohio St.3d 38, 41, 741 N.E.2d 121 ("the act 'provides the statutory mechanism for providing cash-wage benefits and medical care to victims of work-connected injuries and for allocating the ultimate cost of such injuries to consumers by augmenting the cost of goods or services that are a product of that work in order to reimburse employers for a prescribed insurance premium' "). At one time, the new majority here also seemed to believe that if the public is to ultimately bear these costs, they should be imposed by their legislators in the General Assembly, not by their judges. See *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005–Ohio–6505, 839 N.E.2d 1, ¶ 42 (Lundberg Stratton, O'Connor, and O'Donnell, JJ., concurring) ("Perhaps a purely psychological or psychiatric condition should be a compensable injury for purposes of workers' compensation; however, it is not mandated under Section 35, Article II of the Ohio Constitution or subject to coverage under the current workers' compensation laws. It is a matter for our General Assembly, and I urge our legislators to consider extending workers' compensation to these injuries. However, I would not mandate coverage by judicial fiat"). This majority now turns that understanding away and expands coverage that did not exist previously.

{¶ 67} I believe that the commission, in its discretion, could properly categorize this case within the voluntary-abandonment doctrine. Our original decision in this case merely reflected that opinion: that it was not an abuse of discretion, on the facts of this case, for the commission to find that Gross voluntarily abandoned his position by repeatedly disregarding his employer's written rules on safety. As we suggested in our unanimous opinion in *State ex rel. Ohio Treatment Alliance v. Paasewe*, 99 Ohio St.3d 18, 2003-Ohio-2449, 788 N.E.2d 1035, ¶ 6, the commission and the courts may distinguish between cases in which the employee's termination is based on intentional misconduct. I do not believe that Gross or the new majority in this case presents us with a valid reason to depart from our precedent that permits the commission to find that intentional misconduct can give rise to a finding of voluntary abandonment.

{¶ 68} The dissent in *Gross I* feared that our decision would invite abuse by employers. That concern, however, should be negated by the limited fact pattern with which we are presented in this case and by our precedent, which indicates clearly that we will not hesitate to scrutinize a claim of termination based on misconduct to ensure that it is not a pretext for termination based on a workers' compensation claim. See, e.g., *State ex rel. Nick Strimbu, Inc. v. Indus. Comm.*, 106 Ohio St.3d 173, 2005-Ohio-4386, 833 N.E.2d 286, ¶ 10 (affirming the commission's "prerogative" to reject an argument of voluntary abandonment if it found that the misconduct was inadvertent rather than deliberate); *Paasewe*, 99 Ohio St.3d 18, 2003-Ohio-2449, 788 N.E.2d 1035, at ¶ 7 ("we have carefully scrutinized—and will continue to carefully scrutinize—claims for TTC that are close in time to a claimant's termination"). Indeed, in *State ex rel. Pretty Prods., Inc. v. Indus. Comm.* (1996), 77 Ohio St.3d 5, 670 N.E.2d 466, we strongly suggested that if a "claimant had been fired because of her industrial injury," id. at 8, 670 N.E.2d 466, a finding of involuntary departure, which does not bar TTD, see id. at 7, 670 N.E.2d 466, citing *State ex rel. Rockwell Internatl. v. Indus. Comm.* (1988), 40 Ohio St.3d 44, 531 N.E.2d 678, could be sustained.

{¶ 69} But the new majority insists that we should ignore that body of law and create an entirely new exception that inures to the benefit of Gross merely because he was injured while playing Russian roulette with safety rules, a conscious decision that had a substantial likelihood of injuring him and his co-workers. I cannot countenance such a result.

{¶ 70} Drawing distinctions between the facts of our prior voluntary-abandonment cases and the facts of this case is not, in and of itself, a failing. But a myopic focus on the temporal proximity of the misconduct and the injury blinds the majority to the important rationale that underlies the voluntary-abandonment rule: "discharge, like incarceration, is often a consequence of behavior that the claimant willingly undertook, and may thus take on a voluntary character." *State*

*ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 121, 623 N.E.2d 1202.

{¶ 71} It is absurd to create an exception to our law so that an employee who acts in clear violation of his employer's rules remains eligible for TTD while, at the same time, we adhere to our precedent for other employees so that they are denied TTD benefits if the rules they violate or the misconduct they commit is not sufficiently inextricable from their injuries—even if there is no dispute that the misconduct is connected to a workplace injury. Let us make no mistake as to the effect of the majority's holding: its practical effect will be to afford TTD to the most dangerous and egregious workplace violators who happen to have caused injury to themselves and others, while permitting the denial of TTD to the more mundane violators. Those who work in environments in which the safety rules are most important are the ones who will bear the risks of the majority's decision most heavily.

{¶ 72} Though I have some concern for their safety, I am not unsympathetic to a young man who is severely burned for any reason, including misconduct. But unlike the majority, I do not believe that Gross's youth and inexperience should be of any moment in our analysis, because this case rests on the undisputed premise that the employer rightfully terminated him for repeated, willful misconduct that is not excused by age or immaturity.

{¶ 73} This young man accepted employment. By doing so, he agreed to perform the tasks of the position, including the proper cleaning of the fryer, and the employer agreed to pay him a fair wage. That the correct method of performing the task was unpleasant is simply a reflection of what we call "work" or a "job." He and his co-workers, who undoubtedly included Gross's peers, i.e., young people who often enter the workforce for the first time with little skill and maturity, could choose to perform the admittedly unpleasant job as directed by their supervisors, resign their employment if they did not wish to do so, or be terminated if they did not do the tasks assigned in accordance with the employer's safety policies and written rules. That is a basic understanding of the free-market workplace, and a lesson many young people learn (or should learn) when they enter the workplace. Our holding in *Gross I* merely stated a corollary to that rule: voluntary abandonment of employment has the consequence of voluntarily abandoning TTD benefits.

{¶ 74} In its rush to render a judgment that accommodates Gross, the majority refuses to permit the commission to apply a valid decision of this court because it does not like the result that follows. But there is no validity in a decision that ultimately rests on nothing more than sympathy and a patently unfair characterization that *Gross I* was based on fault and permitted the use of negligence analysis in the workers' compensation scheme. In fact, we expressly disavowed

that notion, finding that this case rests on willful, and not negligent, conduct. *Gross I*, 112 Ohio St.3d 65, 2006-Ohio-6500, 858 N.E.2d 335, ¶ 32. It is at best disingenuous to imply that we invited negligence into the equation or that the denial of TTD compensation was based on fault.

{¶ 75} This is not an instance of horseplay in the workplace gone awry. The denial of TTD to Gross was based on the commission's finding that he had voluntary abandoned his employment by intentional disregard of his employer's rule, not because he was at fault for the injuries that ensued or because he was injured as a result of the misconduct. I am not prepared to say that that conclusion was so arbitrary or capricious that it constituted an abuse of discretion and cannot stand. In *State ex rel. Avalon Precision Casting Co. v. Indus. Comm.*, 109 Ohio St.3d 237, 2006-Ohio-2287, 846 N.E.2d 1245, ¶ 9, we described our deference to the commission: " 'The appropriate standard guiding our review is whether there is "some evidence" in the record to support the commission's decision. * * * If so, then the commission will not be deemed to have abused its discretion, and the granting of the writ of mandamus to correct an abuse of discretion is not warranted.' *State ex rel. Secreto v. Indus. Comm.* (1997), 80 Ohio St.3d 581, 582–583, 687 N.E.2d 715. This court's role is not to 'micromanage the commission as it carries out the business of compensating for industrial/occupational injuries and illnesses.' *State ex rel. Mobley v. Indus. Comm.* (1997), 78 Ohio St.3d 579, 584, 679 N.E.2d 300."

{¶ 76} Nor, for the reasons stated above, do I believe that the commission went beyond the scope of well-settled law. Even if we were to concede, and we do not, that the commission's application of *Louisiana–Pacific* was not entirely correct, that error would not satisfy the abuse-of-discretion standard, which requires Gross to show "more than an error of law or of judgment." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144.

{¶ 77} Finally, for prudential concerns, I believe that we must remember that this matter is before us on a motion for reconsideration. Apart from my belief that the new majority's holding lacks legal merit, I am not satisfied that the appellant has discharged his burden for reconsideration.

{¶ 78} The standard for reconsideration is nebulous, but we have suggested that we grant such motions when persuaded, "upon reflection," to deem our prior decision as having been made in error. See, e.g., *State ex rel. Huebner v. W. Jefferson Village Council* (1996), 75 Ohio St.3d 381, 383, 662 N.E.2d 339. As set forth in our rules, "A motion for reconsideration * * * shall not constitute a reargument of the case * * *." S.Ct.Prac.R. XI(2).

{¶ 79} We are not presented with any new fact or legal argument that we failed to consider in *Gross I*. The grounds for reconsideration set forth by the majority are largely claims that have been made, and rejected, previously. They are

nothing more than a reargument of the case and, accordingly, our rules should prevent us from considering it, see, e.g., *State ex rel. Shemo v. Mayfield Hts.*, 96 Ohio St.3d 379, 2002-Ohio-4905, 775 N.E.2d 493, ¶ 9, even if the members of the new majority are not wholly persuaded that the original decision was correct. *Toledo Edison Co. v. Bryan* (2001), 91 Ohio St.3d 1233, 1234, 742 N.E.2d 655 (Pfeifer, J., concurring).

{¶ 80} There is no showing that we wrongly decided this case in the first instance. I am left with the firm belief that we are not reconsidering our prior decision as much as we are simply retreating from it in the face of public criticism. Having considered the supplemental arguments by appellee and amici, I would deny the motion for reconsideration.

LANZINGER, J., concurs in the foregoing opinion.

**LANZINGER, J., dissenting.**

{¶ 81} The new majority opinion illustrates the maxim "Bad cases make bad law." I wholeheartedly join in the well-reasoned dissenting opinion of Justice O'Connor.

Hochman & Plunkett Co., L.P.A., Gary D. Plunkett, Brett R. Bissonnette, and Todd T. Miller, for appellee David M. Gross.

Scheuer, Mackin & Breslin, L.L.C., Edna Scheuer, Robert S. Corker, and Salvatore A. Gilene, for appellant.

Marc C. Dann, Attorney General, Elise Porter, Gerald H. Waterman, and Andrew J. Alatis, Assistant Attorneys General, for appellee Industrial Commission.

Philip J. Fulton Law Office and Philip J. Fulton, urging reconsideration for amicus curiae Ohio Academy of Trial Lawyers.

Stewart Jaffy & Associates Co., L.P.A., Stewart R. Jaffy, and Marc J. Jaffy, urging reconsideration for amicus curiae Ohio AFL–CIO.

Benesch, Friedlander, Coplan & Aronoff, L.L.P., N. Victor Goodman, and Mark D. Tucker, urging reconsideration for amicus curiae Ohio State Building and Construction Trades Council.

Stephen E. Mindzak Law Offices, L.L.C., Stephen E. Mindzak, and Shareef S. Rabaa, urging reconsideration for amicus curiae United Auto, Aerospace & Agricultural Implement Workers of America.

Paul C. Cox, Chief Counsel, urging reconsideration for amicus curiae Fraternal Order of Police.

Garvin & Hickey, L.L.C., Preston J. Garvin, and Michael J. Hickey, opposing reconsideration for amicus curiae Ohio Chamber of Commerce.

Vorys, Sater, Seymour & Pease, L.L.P., and Robert A. Minor, opposing reconsideration for amici curiae Ohio Self–Insurers Association and Ohio Council of Retail Merchants.

Bricker & Eckler, L.L.P., and Thomas R. Sant, opposing reconsideration for amici curiae Ohio Chapter of the National Federation of Independent Business and the Ohio Manufacturers Association.