DECISION
{¶ 1} Relator, International Truck and Engine Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Edward C. Moritz ("claimant") for *Page 2 
an additional award for a violation of a specific safety requirement ("VSSR"), and to enter an order denying the application.
 {¶ 2} This court referred this matter to a magistrate pursuant to Civ. R. 53(C) and Loc. R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law, recommending that this court deny the requested writ. (Attached as Appendix A.) No party has objected to the magistrate's findings of fact, and we adopt them as our own.
 {¶ 3} In brief, the commission found that claimant had violated a specific safety requirement in connection with claimant's injury. That requirement, Ohio Adm. Code 4123:1-5-14(G)(1) (formerly Ohio Adm. Code 4121:1-5-14[G][1]), provides that "[d]efective crane safety devices or load-carrying equipment shall be repaired or replaced." The equipment at issue here are rollers attached to the overhead rail trolley that struck and injured claimant. Prior to the injury, relator had replaced defective rollers, but had done so incorrectly. Through its objections, relator claims that, because it "replaced" the defective rollers, it met the safety requirement. However, we agree with the magistrate's discussion and resolution of this issue. Although relator replaced the defective equipment, it did so improperly and only created a new defect that caused the injury. Therefore, it did not meet the safety requirement, and we overrule relator's objections.
 {¶ 4} Having conducted an independent review of the record in this matter, and finding no error of law or other defect on the face of the magistrate's decision, this court adopts the magistrate's decision as our own, including the findings of fact and *Page 3 
conclusions of law contained in it. In accordance with the magistrate's decision, the requested writ is denied.
Objections overruled, writ of mandamus denied.
 BRYANT and KLATT, JJ., concur. *Page 4 
 APPENDIX A MAGISTRATE'S DECISION {¶ 5} In this original action, relator, International Truck and Engine Corporation, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting the application of respondent Edward C. *Page 5 
Moritz ("claimant") for an additional award for a violation of a specific safety requirement ("VSSR"), and to enter an order denying the application.
Findings of Fact: {¶ 6} 1. On January 10, 2004, claimant sustained an industrial injury while employed with relator. The industrial claim is allowed for "dislocated shoulder NOS-open left," and is assigned claim number 04-808264.
 {¶ 7} 2. On January 10, 2006, claimant filed an application for an additional award for alleged multiple violations of specific safety requirements. On the application, claimant described how the injury occurred:
 I was standing on an oil mat, mounting a transmission, which was suspended by a single chain and hoist. The single bolt securing the hoist to the track overhead dislodged. Because the chain was too short and the transmission was side loaded, the transmission swung into my shoulder causing my injuries when the hoist fell.
 {¶ 8} Among the safety rules alleged to have been violated was Ohio Adm. Code 4123:1-5-14(G)(1) formerly found at Ohio Adm. Code 4121:1-5-14(G)(1).
 {¶ 9} 3. The application prompted the Safety Violations Investigation Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau") to conduct an investigation.
 {¶ 10} 4. On June 6, 2006, the SVIU special investigator issued a written report containing several exhibits. According to the report, the employer stated that the hoist was purchased and installed by outside contractors in May 2000.
 {¶ 11} 5. Among the exhibits to the SVIU report is the affidavit of claimant executed March 29, 2006. Claimant's affidavit states: *Page 6 
 2. On the day I sustained my injury I was working in department 62 of the employer and was performing my regular assigned job duties. My assigned duties, on the day of my injury, was mounting new automatic transmissions to the new truck motors/engines by use of an electrically powered, hand-held controlled, ½ ton capacity over-head hoist, manufactured by the Demag Company. I was being assisted by another full-time International employee, by the name of Brion Blankenship, who was a co-assembler (Brion and I had the responsibility of tightening the new transmission to the new motor). I would hook the hoist in question to the new transmission that had been built on the carrousel. Once the new transmission is built, I would hook the hoist in question to the newly built transmission, then I transported same, by use of the hoist in question, to the area where Brion Blankenship and I would assemble the new transmission to the new truck motor.
 * * *
 4. While in the process of transporting (walking) a newly built transmission to be assembled, the hoist broke loose from the steel trolley bracket — the hoist was positioned at the end of the bridge trolley, the end near the carrousel.
 5. When the hoist broke loose, this action caused the transmission to swing out of control, whereby, the transmission did hit my shoulder (left side), thus resulting in my injury. The hoist did land/fall into [sic] the floor when it broke loose from the bridge trolley.
 {¶ 12} 6. Among the exhibits to the SVIU report is the affidavit of Brion Blankenship executed April 21, 2006. The Blankenship affidavit states:
 * * * In January of 2004, I was employed in Department 62 as an Assembler. I was a witness to at least some portion of the events surrounding the injury to Ed Moritz.
 1. On the date of the accident, we had just come back from 14 months of layoff. I was employed at the time as a "transmission helper." I worked with Mr. Moritz, who was a "transmission mounter."
 2. This job requires a certain amount of finesse. I had performed the job that Mr. Moritz performed on prior occasions and I assisted Mr. Moritz on the date of the accident. *Page 7 
 3. Prior to the date of the accident, we had been experiencing a problem with the rollers on the trolley that are part of the hoist system. We had reported this to our supervisor. I was told that someone from the maintenance department replaced certain Teflon rollers on the trolley system which seemed to cure the problem we had been having with the trolley getting hung up.
 4. On the morning of the accident, which occurred at approximately 9:30, shortly before our break, Mr. Moritz was picking up a transmission using the hoist and trolley. While doing so, one end of the cross member that travels back and forth on the trolley rails came loose. This cross member fell towards the ground and struck Mr. Moritz on the shoulder. The transmission remained attached to the hoist but fell to the ground when the cross member came loose.
 5. After the accident, I spoke with someone from the maintenance department, whose name I do not know. This person told me that he believed that the reason the cross member had come loose was that someone has installed the wrong nut when repairs were made to the Teflon rollers prior to the accident. I was told that after the accident, the correct nut was installed and that a cotter pin was also added as an additional precaution.
 {¶ 13} 7. On January 18, 2007, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
 {¶ 14} 8. At the hearing, two witnesses testified. Claimant testified on his own behalf. Deborah Blake testified on behalf of relator.
 {¶ 15} 9. During the hearing, the following exchange occurred between Blake and the SHO:
 MS. BLAKE: So where these (indicating) are mounted up on the orange rail — like here (indicating), if that's the — whichever hoist she's using, the mounting plate that this (indicating) hooks onto to this (indicating) is where that screw and the nut came loose. The hoist itself never was a party of — The hoist is not defective. This (indicating) came loose where the screw — the nut fell — stripped out of the — *Page 8 
 THE HEARING EXAMINER: That holds the hoist up?
 MS. BLAKE: Yes.
 THE HEARING EXAMINER: So when this (indicating) failed, this — the screw came loose, the hoist came down sideways or what?
 MS. BLAKE: This (indicating) dropped down which then swung the transmission.
(Tr. 32-33.)
 {¶ 16} 10. During the hearing, the following exchange occurred among counsel for relator, the SHO and Blake:
 [Relator's counsel]: And he simply said that he was told from someone that the maintenance department replaced certain Teflon rollers on the trolly system which seemed to cure the problems that they were having and that the particular nut that then was replaced on the bolts when they put that — and this particular bolt was the — was not the right nut, whether it was not the right size or whatever, and it came off. And that's purely and simply the cause of the accident. And that was then — and that was then replaced with the proper nut. But that was the only repair that was ever made.
 [SHO]: Now, my question I have is that repair that you said happened, when it was made, where are those records since we have maintenance records for the hoist?
 [Relator's counsel]: Well, I don't know. I'll have to look and see.
 [SHO]: Ms. Baker?
 [Relator's counsel]: I don't know if there was — I don't know if there's a record when they replaced the nut or not.
 MS. BLAKE: That I'm awar[e] of — No, they just do it. Not — not everything is documented by —
(Tr. 34-35.) *Page 9 
 {¶ 17} 11. At the hearing, relator's counsel argued to the SHO: "You know, the only repair that was necessary following this instance was to put the proper nut on this particular bolt." (Tr. 37.)
 {¶ 18} 12. A similar statement was thereafter made by Blake: "We put the same apparatus right back up with a different nut." (Tr. 44.)
 {¶ 19} 13. Following the January 18, 2007 hearing, the SHO issued an order finding a violation of former Ohio Adm. Code 4121:1-5-14(G)(1). The SHO's order explains:
 It is the order of the Staff Hearing Officer that the injured worker was employed on the date of injury noted above, by the employer as an assembly line worker; that the injured worker sustained an injury in the course of and arising out of employment when a bolt incorrectly installed to an overhead track dislodged from the track causing the hoist equipment to swing and strike the injured worker. The evidence on file indicates the employer repaired the rollers on the overhead track trolley rail and the maintenance man installed the incorrect bolt to connect the overhead track to the trolley system. The trolley system is attached to the hoist, which is used to move the transmissions to the work station. The injured worker alleges that the employer did not use the equipment in accordance with the manufacturers standards. He states that because the chain was too long the hoist would swing out placing torque on the rail, which caused the hoist to fall.
 * * *
 O.A.C. 4121:1-5-14 — This is the provision of the Administrative Code that governs Power-Drive Cranes and Hoists.
 O.A.C. 4121:1-15-14(G) Specific requirements applicable to all sections of 4121:1-5-14 applicable to all sections.
 (1) Defective safety devices or load-carrying equipment.
 "Defective crane safety devices or load-carrying equipment shall be replaced." *Page 10 
 It is the order of the Staff Hearing Officer that the injured worker has presented sufficient evidence that the employer failed to correctly repair load carrying equipment. The employer replaced defective rollers which were attached to the overhead rail trolley which is connected to the hoist equipment, but the employer failed to correctly install the correct bolt which holds the system in place. The failure of the employer to properly repair the overhead trolley caused the bolt to dislodge which caused the hoist to swing out and strike the injured worker. The Staff Hearing Officer finds this failure to properly repair the overhead trolley system was the proximate cause of the accident.
 * * * The finding and order are based upon the testimony of the injured worker, Ms. Blake, investigation pictures, manufacturer manual, investigation report and affidavits on file.
 {¶ 20} 14. Relator moved for rehearing under Ohio Adm. Code 4121-3-20(C).
 {¶ 21} 15. On May 22, 2007, another SHO mailed an order denying rehearing. The order states:
 The Staff Hearing Officer finds that the Staff Hearing Officer order did not graft extra legal requirement onto Ohio Administrative Code 4121:1-5-14(G)(1). It is clear, from the record, that the equipment in question was not "repaired" as the repair obviously failed resulting in this industrial claim.
 {¶ 22} 16. On July 6, 2007, relator, International Truck and Engine Corporation, filed this mandamus action.
Conclusions of Law: {¶ 23} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 24} Former Ohio Adm. Code Chapter 4121:1-5 sets forth specific safety requirements for workshops and factories. *Page 11 
 {¶ 25} Former Ohio Adm. Code 4121:1-5-14 is captioned "Power-driven cranes and hoists."
 {¶ 26} Former Ohio Adm. Code 4121:1-5-14(G)(1) provides:
 (G) Specific requirements applicable to all paragraphs of this rule.
 (1) Defective safety devices or load-carrying equipment.
 Defective crane safety devices or load-carrying equipment shall be repaired or replaced.
 {¶ 27} Here, relator points to the commission's finding that relator "replaced the rollers connected to the hoist when it was made aware that something was wrong with the rollers." Relator then concludes that "[t]he mere fact that, in connection with that replacement, a maintenance man inadvertently installed the wrong sized nut on one of the bolts securing the system does not and cannot constitute a violation of the cited Requirement." (Relator's brief at 5; Emphasis sic.) According to relator, the evidence shows that it complied with the safety rule (by replacing the rollers). Id.
 {¶ 28} Relator cites to State ex rel. Trydle v. Indus. Comm. (1972),32 Ohio St.2d 257, State ex rel. Jeep v. Indus. Comm. (1989),42 Ohio St.3d 83, and State ex rel. Arce v. Indus. Comm., 105 Ohio St.3d 90,2005-Ohio-572, citing State ex rel. Burton v. Indus. Comm. (1989),46 Ohio St.3d 170.
 {¶ 29} While those cited cases present well-settled principles of law applicable to VSSR mandamus review, those principles do not advance relator's conclusion that the installation of the wrong sized nut by relator's maintenance man cannot constitute a violation of the specific safety rule at issue here. *Page 12 
 {¶ 30} Paragraph one of the syllabus in Trydle states:
 The term, "specific requirement," as used in Section 35, Article II of the Constitution of Ohio, does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission, and which are of a character plainly to apprise an employer of his legal obligation toward his employees.
 {¶ 31} In Jeep, the commission granted a VSSR award for the employer's failure to guard a foot treadle that activated a mechanical power press. On the date of injury, the claimant had his left arm around a guide post on the inside of the press. While it is not precisely known what caused the accident, apparently either falling stock or claimant's foot hit the foot treadle causing the press to cycle onto claimant's arm. At the time of the accident, this treadle was covered on the back, top and sides, but the front cover was missing.
 {¶ 32} In the mandamus action, Jeep argued that the safety rule was neither specific nor of a character to plainly apprise an employer of its legal obligation toward its employees. The safety rule stated that an object is "guarded" when it is "covered, fenced, railed, enclosed or otherwise shielded from accidental contact." Id. at 84. InJeep, the employer contended that, under the definition, an object is "guarded" only when protected from all possible accidental contact. In order to do so, Jeep contended that the treadle would have to be totally enclosed, rendering it useless. The Jeep court rejected the argument:
 * * * First, a requirement does not lose its specificity because it is not fool-proof. IC-5-01.01 describes the purpose of specific safety requirements as providing reasonable, not absolute, safety for employees. Decisions of this court have *Page 13 
acknowledged the practical impossibility of guaranteeing that a device will protect against all contingencies or will never fail. See State, ex rel. Harris, v. Indus. Comm. (1984), 12 Ohio St.3d 152[.] * * * As noted in Harris, "the commission has the discretion to interpret its own rules; * * * where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail." Id. 12 Ohio St.3d at 153[.] * * * In this case, common sense dictates that the safety requirement does not contemplate total treadle enclosure-and thus inoperability-in order to be "specific."
 We also find that the requirement adequately apprises the employer of its duty towards employees, i.e., to shield the treadle from accidental contact. We note that previous decisions of this court have indicated that terms such as "substantially guarded" and "unguarded" are specific. * * *
Id. at 84.
 {¶ 33} In its brief, relator cites to Jeep for the court's statement that the purpose of a safety rule is to provide "reasonable[,] not absolute[,] safety for employees." In its brief, relator also citesJeep for the court's recognition of the "practical impossibility of guaranteeing that a device will protect against all contingencies and will never fail." (Relator's brief at 3.)
 {¶ 34} Relator then cites Arce for the well-settled proposition: "because a VSSR is a penalty, it must be strictly construed, and all reasonable doubts concerning the interpretation of the specific safety requirement must be construed against its applicability to the employer." Id. at ¶ 19.
 {¶ 35} Apparently, invoking specificity (Trydle) and the rule of strict construction, relator contends that, in holding that relator failed to "`properly' repair" the overhead trolley system (by installing the wrong sized nut), the commission "unilaterally expanded an employer's obligation" under the rule and "liberally construed its application" contrary *Page 14 
to law. Relator also claims that the commission improperly "introduced the concept of negligence into a system that is historically and necessarily `no fault.'" (Relator's brief at 5.)
 {¶ 36} In the magistrate's view, relator's argument, in effect, invites this court to construe the word "repair" in such manner as to eliminate any requirement that the repair be properly performed. That is, relator invites this court to accept the notion that relator discharged its duty under the safety rule by simply making a repair of the overhead trolley system even though the repair was performed with the wrong sized nut causing the injury of record.
 {¶ 37} Neither the rule of specificity nor the rule of strict construction required the commission to construe the word "repair" so that the duty to repair does not encompass a repair properly done. Clearly, the commission did not "unilaterally expand an employer's obligation" under the rule, as relator has argued here.
 {¶ 38} In its reply brief, relator cites to State ex rel. Gross v.Indus. Comm., 115 Ohio St.3d 249, 2007-Ohio-4916, at ¶ 54, to support its argument that the commission's finding of a safety rule violation improperly introduces the concept of negligence into the VSSR proceeding. Relator quotes from a dissenting opinion in Gross:
 Workers' compensation coverage is rightfully extended to employees who act unwisely, negligently, or stupidly. * * * We have adhered to that rule for nearly 100 years, based on the principle that workers' compensation is a "mutual compromise between the interests of the employer and the employee[.]" * * *
 {¶ 39} Citing the above-quoted portion of the dissenting opinion inGross, relator suggests that an employer can never be held liable in a VSSR for negligently failing to comply with a safety rule. According to relator, that the maintenance man "inadvertently" *Page 15 
installed the wrong sized nut on one of the bolts securing the system cannot constitute a violation of the safety rule. Relator is incorrect.
 {¶ 40} To begin, the majority opinion in Gross expresses a similar idea:
 The no-fault nature of our workers' compensation scheme is a statutory mandate. R.C. 4123.01(C) defines "injury" without qualification so long as it arises out of the course of employment. Except as expressly set out in the statute, workers' compensation benefits may not be denied on the basis of fault to a claimant who was injured in the course and scope of employment. * * *
Id. at ¶ 22.
 {¶ 41} Obviously, the above-quoted pronouncements in Gross have no applicability to a VSSR matter. In Gross, the question was whether the claimant was precluded from receiving temporary total disability compensation on grounds that he allegedly voluntarily abandoned his employment when his violation of his employer's safety rule led to his injury. Gross does not stand for the proposition, as suggested by relator, that fault or negligence is never relevant in a VSSR proceeding.
 {¶ 42} In a VSSR proceeding, even the negligence of an injured claimant can preclude a VSSR award under some circumstances. SeeState ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988),37 Ohio St.3d 162. (The claimant's alleged negligence is a defense only where the employer has first complied with the relevant safety requirements.)
 {¶ 43} In short, relator's reliance on Gross is misplaced. Clearly, relator can be held liable in a VSSR for a negligent failure to properly repair defective load carrying equipment when a safety rule requires repair. *Page 16 
 {¶ 44} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1