OPINION *Page 2 
{¶ 1} Plaintiff-Appellant, Connie Polanco ("Connie"), individually and as personal representative of the estate of Ynacio Polanco ("Ynacio"), appeals the January 8, 2007 judgment of the Paulding County Court of Common Pleas granting summary judgment in favor of Defendant-Appellee, Maremont Corporation ("Maremont").
 {¶ 2} This matter stems from the employment of Connie's husband, Ynacio, by Maremont. From 1966 until 1979, Ynacio was employed by Maremont, [1] a brake manufacturing plant in Paulding County, Ohio. On April 14, 2002, Ynacio died due to mesothelioma.
 {¶ 3} On April 14, 2003 Connie filed a wrongful death and survivorship complaint, individually and as personal representative of Ynacio, against Maremont and thirty-six other defendants. In her complaint, Connie alleged that Ynacio died in April 2002 from mesothelioma, a lung cancer caused by inhalation of raw asbestos particles. Connie argued that Ynacio was exposed to asbestos as part of his employment with Maremont between 1966 and 1979, which caused his death.
 {¶ 4} In August 2006, Maremont filed a motion for summary judgment, asserting that Ohio's Workers' Compensation statute precluded Connie's claims *Page 3 
because she could not prove an intentional tort. In October 2006, Connie filed a memorandum in opposition to Maremont's request for summary judgment with various documentary evidence attached. In December 2006, Connie supplemented her opposition to Maremont's motion for summary judgment with additional documents.
 {¶ 5} In January 2007, the trial court granted summary judgment in Maremont's favor, concluding:
 The Court finds that [Connie] has presented no materials of the evidentiary quality required by Rule 56 of the Ohio Rules of Civil Procedure from which reasonable minds could conclude that at the time [Ynacio] was employed by Maremont Corporation that Maremont Corporation had actual knowledge that there was a substantial certainty that [Ynacio] was subject to harm as a result of his exposure to the levels of concentration of asbestos then existing in their facility.
 The Court therefore finds that there is no genuine issue as to any material fact and, construing the evidence most strongly in favor of [Connie], that reasonable minds can come to but one conclusion and that conclusion is that the Defendant, Maremont Corporation, is entitled to judgment as a matter of law.
(January 2007 Judgment Entry, p. 3). Thereafter, Connie appealed the judgment of the trial court to this Court.
 {¶ 6} In October 2007, this Court dismissed the appeal for lack of jurisdiction because multiple defendants had not been dismissed and remained as parties to the litigation in the trial court. SeePolanco v. Asbestos Corporation, *Page 4 LTD., et al, 3rd Dist. No. 11-07-03, 2007-Ohio-5488. Subsequently, the trial court amended the January 9, 2007 decision, making it a final appealable order.
 {¶ 7} Connie now appeals, asserting a single assignment of error.
 THE TRIAL COURT ERRED WHEN IT GRANTED THE DEFEND ANT-APPELLEE'S MOTION FOR SUMMARY JUDGMENT.
 {¶ 8} In her sole assignment of error, Connie contends that the trial court erred in granting Maremont's motion for summary judgment. Specifically, Connie asserts that Maremont was aware of the dangers posed to its employees by asbestos; that Maremont was aware that injury was substantially certain to occur as a result of its employees' exposure to asbestos; and, that, despite such knowledge, Maremont required its employees to perform work that exposed them to asbestos.
 {¶ 9} An appellate court reviews a grant of summary judgment independently, and without any deference to the trial court.Conley-Slowinski v. Superior Spinning Stamping Co. (1998),128 Ohio App.3d 360, 363, 714 N.E.2d 991. The standard of review for a grant of summary judgment is de novo. Hasenfratz v. Warnement 3rd Dist. No. 1-06-03, 2006-Ohio-2797 citing Lorain Nat'l. Bank v. Saratoga Apts.
(1989), 61 Ohio App.3d 127, 572 N.E.2d 198.
 {¶ 10} A grant of summary judgment will be affirmed only when the requirements of Civ. R. 56(C) are met. This requires the moving party to establish: (1) that there are no genuine issues of material fact, (2) that the moving party is *Page 5 
entitled to judgment as a matter of law, and (3) that reasonable minds can come to but one conclusion and that conclusion is adverse to the non-moving party, said party being entitled to have the evidence construed most strongly in his favor. Civ. R. 56(C); see Horton v. HarwichChem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, 1995-Ohio-286, paragraph three of the syllabus. Additionally, Civ. R. 56(C) mandates that summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
 {¶ 11} The party moving for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 116, 526 N.E.2d 798. The moving party also bears the burden of demonstrating the absence of a genuine issue of material fact as to an essential element of the case. Dresher v. Burt (1996),75 Ohio St.3d 280, 292, 662 N.E.2d 264, 1996-Ohio-107. Once the moving party demonstrates that he is entitled to summary judgment, the burden shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial. See Civ. R. 56(E). *Page 6 
 {¶ 12} In ruling on a summary judgment motion, a court is not permitted to weigh evidence or choose among reasonable inferences, rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. Jacobs v. Racevskis (1995), 105 Ohio App.3d 1, 7,663 N.E.2d 653.
 {¶ 13} In the present case, the trial court was supplied with an extensive list of documents in Connie's opposition to summary judgment and her supplement to her opposition. The documents supplied to the trial court include the following, supplied with Connie's memorandum in opposition to summary judgment:
 1. Document entitled "Formula costs" showing that asbestos was a primary ingredient in Maremont's products. (Bates-stamp MAR 007669).
 2. Document entitled "Results of Air Samples for Maremont-Grizzly Corporation," dated February 1968. Includes a letter from the Assistant Chief of Environmental Activities for the Occupational Health Program to Maremont's plant manager stating that the analysis of air samples taken at the plant in September 1968 showed that the asbestos dust concentration at the plant exceeded the concentration limit permitted in Great Britain; stating that a standard had not yet been adopted in the United States; and, recommending that employees wear respirators in high concentration areas. (Bates-stamp MAR 007679).
 3. Maremont inter-office memorandum entitled "OSHA expenditures," dated September 1975, stating the expenditures that would be required in the following years to improve asbestos dust control, including installation of a vacuum and agglomeration system, and stating that the corporation anticipated OSHA [Occupational Safety and Health Administration] enactment of "action levels" for asbestos. (Bates-stamp MAR 007181).
 4. Document entitled "Proposed OSHA-AIA response," dated April 1976, recommending that OSHA impose a laxer standard for asbestos dust concentration levels because "no new medical evidence has been compiled to justify such a reduction [in the permitted concentration *Page 7 
levels]"; requesting that OSHA's standard holding employers completely responsible for ensuring that employees take precautionary measures be changed; and, concluding that the proposed OSHA standards would be "quite burdensome and expensive." (Bates-stamp MAR 007192).
 5. Maremont's responses to interrogatories in Addie Tuck v. ACS, Inc., et al., a Georgia state case, admitting that "Maremont does not know when it first became aware of potential adverse health consequences of airborne asbestos. However, it was a matter of general knowledge from the 1960s onward that prolonged exposure to airborne asbestos could possibly be harmful."
 6. Affidavit of Dr. Edwin Holstein stating that asbestos fibers are potentially dangerous to the lungs of an exposed individual
 7. Surgical pathology report and letters from medical professionals diagnosing Ynacio with mesothelioma and a letter from a medical professional concluding that Ynacio developed mesothelioma due to repeated asbestos exposure and that this caused his death.
 8. Affidavit of Michael Ellenbecker concluding that "asbestos fibers can be found suspended in the atmosphere of an industrial plant indefinitely, even years after they were released into the air."
 9. Deposition testimony of Charlie Egnor that he was employed at the Grizzly-Maremont plant with Ynacio for thirteen years; that everything Ynacio handled contained asbestos because that was the material they used to make the brake products.
 10. Deposition testimony of Dwayne Grunden that he was employed at Maremont for approximately eleven years; that Ynacio worked around brake linings and clutch facings containing asbestos; that the employees worked around steam pipes that were wrapped in asbestos; that "everything you touched in the plant" contained asbestos; that OSHA eventually required the plant to install a system to remove dust; that there was asbestos powder "all over" the building; that he had a conversation with the Maremont union regarding asbestos causing cancer, but that the company was unresponsive; that he complained to Maremont management about how dirty and dusty the plant was; that he did not believe the Maremont union was concerned with employee safety; and, that he never observed Ynacio wearing a mask before OSHA began requiring it in 1976.
The following documents were included with Connie's supplement to her memorandum in opposition: *Page 8 
 11. Document entitled "Engineering Data" showing that Maremont's products contained asbestos. (Bates-stamp MAR 007669-007678).
 12. Document entitled "Outstanding Purchase Order Commitments," dated May 1977, listing asbestos manufacturers as suppliers for the Paulding plant. (Bates-stamp MAR 007332).
 13. Document entitled "Raw Materials Quality Control Specifications," dated March 1977, showing that Maremont's products contained asbestos. (Bates-stamp MAR 000932).
 14. Document entitled "Results of Air Samples at Maremont-Grizzly Corporation in Paulding," showing that an air sample in one area was four times the acceptable OSHA level, and showing that another study was conducted in September 1966 and that comparison with this previous study indicated a significant improvement in dust levels. (Bates-stamp MAR 007685-007688).
 15. Maremont inter-office memorandum entitled "OSHA follow-up Inspection," dated February 1975, stating that OSHA had cited the plant for twenty-three violations in August 1975, and that, upon re-inspection, all but three violations had been rectified. One of the three violations remaining unsatisfactory was the improper labeling of asbestos containers. (Bates-stamp MAR 001729-001730).
 16. Maremont inter-office memorandum entitled "OSHA/EPA Activity Report for April 1976," dated May 1976, stating that the results of asbestos dust samples showed all areas of the plant were in compliance with present OSHA standards; that all but one area were in compliance with the newly enacted standards set for July; and suggesting modifications to bring this area to compliance by July. (Bates-stamp MAR 001726-001727).
 17. Citations for OSHA violations against Maremont, including that "[c]aution signs were lacking in the mixing area next to the aisleway where large open tubs of asbestos were kept"; and "raw asbestos and mixtures were found stored in large metal tubs without the proper caution labels[.] * * *" (Bates-stamp MAR 001718-001722).
 18. Letter to OSHA from Maremont, dated April 1976, containing a progress report on the February 1976 OSHA violations including that the proper labeling and caution signs for asbestos were completed in March. (Bates-stamp MAR 001723-001724).
 19. Document dated March 1976, showing that Maremont expanded its annual x-ray and pulmonary examinations to conform with OSHA requirements. (Bates-stamp MAR 001717). *Page 9 
Additionally, Connie attached numerous documents produced by or received by the Friction Materials Standards Institute ("FMSI"), an incorporated organization founded to publish data on automotive materials. Maremont was a member of FMSI and one of Maremont's employees served respectively as chairman, vice president, and president of FMSI for several years. These FMSI documents include the following:
 • "Review of Projects and Activities of Committee" (this document itself is undated, although each section of the review is dated by year)
 • 1970: acknowledges that OSHA was created by law in December, 1970.
 • 1971: notes that the President of FMSI called for creation of a committee to address problems that could arise in the asbestos products industry from OSHA; that the Asbestos Study Committee had a meeting in September, 1971; that the Illinois Pollution Control Board proposed regulations on asbestos including prohibition on its use in brake lining of vehicles manufactured after January 1975 and sold for use in Illinois; that the FMSI responded to the Illinois Pollution Control Board and the proposed asbestos ban in brake linings was dropped; and, that OSHA released emergency temporary standards for asbestos in late 1971.
 • 1972: FMSI's committee held a demonstration session on means for monitoring asbestos fibers in the workplace; distributed to members the OSHA standards for exposure to asbestos dust (effective 7-7-72); and circulated a survey on labeling practices and interpretation of OSHA's standards on "locked in asbestos" in friction materials.
 • 1973: advised members of FMSI on results of labeling practices survey; sent members a list of independent laboratories which conduct asbestos counts; distributed copies of EPA "National Emission Standards for Hazardous Air Pollutants (Asbestos)," essentially "no visible emissions"; cooperated with EPA contractors on technical and economic impacts on manufactures from proposed effluent guidelines for asbestos products manufacturers.
 • 1974: sent recommendations to Asbestos Information Association (AIA) on their comments to OSHA on proposed revisions to the asbestos standard; provided input to AIA on their "work practices for *Page 10 
users and fabricators of asbestos friction materials"; commented directly to the EPA on their National Emissions Standards for Asbestos.
 • 1975: distributed to members the NIOSH recommended interim practices for asbestos brake and clutch servicing; reflects that OSHA published its proposed revisions to the asbestos standard; that FMSI's committee reviewed the proposed changes and recommended comments by individual members on the OSHA standard proposals; committee organized and sponsored a seminar on asbestos.
 • 1976: FMSI commented directly to OSHA objecting to several sections of OSHA's proposals for revision to the asbestos standard.
 • "Recommended Procedures for Reducing Asbestos Dust During Brake Servicing" in an undated pamphlet, which FMSI reprinted and distributed. The pamphlet specifically references 1976 OSHA standards
 • Letter from I.H. Weaver, corporate director of environmental control for Raybestos Manhattan Co., to E.W. Drislane, executive director of FMSI, dated July 17, 1975.
 • Attaches article from a 1975 issue of "Public Health Reports" entitled "The Hazards of Asbestos for Brake Mechanics," which states that "Cancer from asbestos is not limited to workers who handle the material. There are also reports of pleural and peritoneal mesothelioma * * * in persons with family, or neighborhood, or indirect occupational exposure to asbestos."
 • Attaches pamphlet entitled "Brake Repair Work Can Be Hazardous To Your Health," which states that "[b]rake linings contain large amounts of asbestos fiber, a substance harmful to your body * * * at present, it is not known what level of exposure to asbestos, if any, is safe. Even a small amount may be dangerous in some circumstances."
 • Letter from I.H. Weaver, corporate director of environmental control for Raybestos Manhattan Co, to E.W. Drislane, of FMSI dated June 10, 1975. States that he observed a British film entitled "Asbestos — Killer Dust" and recommends that the film be shown at the next FMSI board meeting.
 • "Proposed Amendments to the OSHA asbestos standard" dated October 30, 1975. A document that is a summary noting that the proposed OSHA rules have stricter requirements than the present OSHA standards. Attached to the summary document is a photocopied *Page 11 
page from a medical journal showing several abstracts including one titled "Evaluation of the Nuisances Caused by Asbestos: Asbestos used in Automobiles." The abstract states: "Lung fibrosis,
 • bronchopulmonary cancer, as well as pleural and peritoneal mesothelioma due to inhaled asbestos in occupationally exposed populations were determined." The latency period of asbestos-related cancer ranged from 15-20 years.
 • "Asbestos and the Friction Material Industry" I.H. Weaver of Raybestos-Manhattan, Inc., chairman of the FMSI Asbestos Study committee, gave the following address in June, 1973 to the annual membership meeting of FMSI. The address discusses the association between chrysotile asbestos used in friction products and mesothelioma and other types of cancer. Weaver also stated that the most significant event in the prior year concerning asbestos hazards was a report from the International Agency for Research on Cancer which "concluded [that a]ll major commercial types of asbestos can cause cancer"; that "since most of us use substantial amounts of chrysotile asbestos in our formulations, association of this material with mesothelioma and other types of cancer is of serious concern."
 • "Draft Comments on Proposed Amendments to OSHA Asbestos Regulations" dated December 30, 1975 from E.W. Drislane, executive director of FMSI, to the Asbestos Study Committee, requesting the committee's comments and input. The Draft of comments state; that the epidemiology based on crocidolite asbestos should not apply to friction materials: "Crocidolite (blue) asbestos is not used in friction materials . . . it is important that epidemiological studies be evaluated with the knowledge that crocidolite is more likely to produce mesothelioma than the chrysotile asbestos used in friction materials. If the mesothelioma evidenced at lower exposure levels was associated primarily with crocidolite asbestos, it is suggested that this evidence not be used in support of a lower exposure level for all asbestos types."
 • Letter from Robert Carullo, of Motor Magazine, from E.W. Drislane, Executive Director of FMSI, dated September 27, 1976. States that "the problem with asbestos occurs if a shop grinds and cuts brake lining segments without good dust collection systems" and that "during removal of old brake linings * * * dust from the brake system can be inhaled if a mechanic uses an air hose * * * [which] is not a good practice." *Page 12 
 • Minutes of the meeting of the Health and Environmental Affairs Committee of the FMSI dated October 1979. Document showing that, when the FMSI Health and Environmental Affairs committee met in October 1979, one member mentioned that FMSI should educate EPA personnel about friction materials and their use of asbestos. "Some regulatory people approach asbestos with almost a paranoid attitude. Some apparently will not even touch an asbestos-containing brake lining. Perhaps they need to be shown the difference between raw asbestos in its fibrous natural makeup and pieces of brake linings and clutch facings which contain locked in asbestos."
(These documents are listed in the order they are attached in Connie's brief.)
 {¶ 14} With respect to the evidentiary requirements of Civ. R. 56(C), a document which does not fit within a category listed in Civ. R. 56 may be introduced as evidentiary material supporting a motion for summary judgment where it is incorporated by reference in a properly framed affidavit. Civ. R. 56(E); Gen. Motors Acceptance Corp. v.Hollanshead (1995), 105 Ohio App.3d 17, 663 N.E.2d 663. The incorporated document must be properly authenticated to be of the evidentiary nature required by Civ. R. 56(C). Id.
 {¶ 15} Maremont would have us exclude the FMSI documents as failing to meet the evidentiary standard of Civ. R. 56. However, we find that the FMSI documents are properly supported by affidavit and are of the requisite evidentiary nature. The FMSI documents were turned over by Maremont during discovery and were accompanied by the affidavit of a paralegal, who received the discovery. The accompanying affidavit states that the paralegal traveled to New York, New York to attend the production of Maremont's discovery. She also avers that the *Page 13 
documents "are a true and accurate copy of the documents that were produced by Maremont on the days of the document production."
 {¶ 16} As a rationale for excluding the FMSI documents, Maremont opines that these documents cannot be properly authenticated. Specifically, Maremont would have us find that these documents do not qualify as ancient documents as defined by Evid. R. 901(B)(8) which provides as follows:
 Evidence that a document or data compilation, in any form, (a) is in such condition as to create no suspicion concerning its authenticity, (b) was in a place where it, if authentic, would likely be, and (c) has been in existence twenty years or more at the time it is offered.
 {¶ 17} Evid. R. 901(B)(8) is not often analyzed by the courts of this State. However, courts that have been called upon to interpret the rule have determined that "[t]he standard to authenticate is not rigorous, and its low threshold reflects an orientation of the Rules toward favoring admission of evidence." Hawn v. Pleasant (June 1, 1999), 4th Dist. No. 98CA2595; Strait v. Baggott (November 14, 1997), 2nd Dist. No. 16078.
 {¶ 18} Specifically, 901(B)(8) has been interpreted to require a three part test for authentication: age, condition, and custody.Matuszewski v. Pancoast (1987), 38 Ohio App.3d 74, 526 N.E.2d 80. In the present case, the age requirement is satisfied by the information contained in the documents themselves. Most documents are specifically dated and those that are not, can be dated by the *Page 14 
information contained in the documents. Moreover, no party has questioned whether the FMSI documents qualify as ancient documents due to age.
 {¶ 19} Additionally, the documents are in good condition, have not been altered, and there has been no assertion to the contrary. However, the concurrence takes issue with the custody requirement of 901(B)(8).
 {¶ 20} The appropriateness of custody depends on the nature of the evidence. Matuszewski, 38 Ohio App.3d 74, 84. Here, we find that documents prepared and received by FMSI would logically be in the custody of Maremont. Maremont was a member of FMSI through the entire period covered by these documents, a Maremont employee was, at one point, on the board of FMSI, and FMSI regularly distributed informational documents to its members, specifically concerning the use of asbestos in manufacturing brake lining. Moreover, several of these documents discuss changes in safety standards concerning the use of asbestos, information pertinent to Maremont, that we would expect Maremont to retain in its files. Accordingly, we elect to consider the FMSI documents in determining the appropriateness of summary judgment.
 {¶ 21} Generally, when an employee is injured in the course of his employment, his only recourse for compensation is the Ohio Workers' Compensation system. See, generally, Arrington v. Daimler-ChryslerCorp., 109 Ohio St.3d 539, 849 N.E.2d 1004, 2006-Ohio-3257. An exception exists, however, where the employee is injured due to an intentional tort by the employer. *Page 15 
In this situation, the injured employee may seek compensation directly from the employer. Boyd v. S.E. Johnson Co., 3rd Dist. No. 11-01-01, 2001-Ohio-2223, citing Blankenship v. Cincinnati MilacronChemicals, Inc. (1982), 69 Ohio St.2d 608, 433 N.E.2d 572.
 {¶ 22} In 1991, the Supreme Court of Ohio established a three-part test that a proponent must satisfy in order to show the element of intent in proving that an employer committed an intentional tort against his employee:
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, 570 N.E.2d 1108, at paragraph two of the syllabus (superseded by R.C. 2745.01 for injuries occurring after April 7, 2005, as stated in Talik v. Fed. MarineTerminals, Inc., 117 Ohio St.3d 496, 2008-Ohio-937, ¶ 17, holding that the Fyffe standard still applies in accidents predating the enactment of R.C. 2745.01) (internal citations omitted). Moreover, a plaintiff must demonstrate all three parts of the test. Flynn v. Herbert, 3d Dist. No. 11-02-04, 2002-Ohio-6598.
 {¶ 23} In the present case, Connie contends that the trial court erred in granting Maremont's motion for summary judgment because Maremont was *Page 16 
aware of the dangers posed to its employees by asbestos; because Maremont was aware that injury was substantially certain to occur as a result of its employees' exposure to asbestos; and, because, despite such knowledge, Maremont required its employees to perform work that exposed them to asbestos.
 {¶ 24} Turning to the first prong of the Fyffe analysis, we must determine whether there is a genuine issue of material fact as to whether Maremont was aware of the danger of asbestos. Numerous statements are contained in the evidence which create a genuine issue of material fact as to whether Maremont was aware of the dangers posed by asbestos. In the Minutes of the Meeting of the Asbestos Study Committee, dated June 1, 1973, attached to Appellant's brief as Exhibit E, the members of the committee are listed, and it is noted that two Maremont employees were present at the meeting. Moreover, these Minutes were found in the possession of Maremont. At the meeting, asbestos handling requirements were discussed, as well as how to properly label areas of a factory where asbestos dust may be generated. Specifically, companies were encouraged to post a standard sign reading "CAUTION-Asbestos dust hazard; avoid breathing dust; wear assigned protective equipment; do not remain in area unless your work requires it; breathing asbestos dust may be hazardous to your health."
 {¶ 25} In a letter addressed to the executive director of FMSI, dated July 17, 1975, it was recommended that a small card be placed in every box containing brake linings indicating that exposure to asbestos should be avoided and indicating *Page 17 
how to properly handle asbestos. Attached to the letter, FMSI received a report entitled "Brake Repair Work Can Be Hazardous to Your Health." The article specifically states "occupational exposure to commercial asbestos minerals enhances the likelihood of a number of diseases — asbestosis and cancers of the lung, pleura, peritoneum, larynx, and gastrointestinal tract." The article states that these diseases often do not appear until more than twenty years after exposure. Also included with the letter was a brochure detailing the "Hazards" of working with asbestos, including:
 Brake Linings contain large amounts of asbestos fiber, a substance harmful to your body
 The risk of lung cancer for people who smoke and work with asbestos is 92-times greater than for people who neither smoke nor work with asbestos
 Among a number of groups of asbestos workers, one out of every five deaths is due to lung cancer.
 The risk of a serious lung disease, called asbestosis, and cancer of other body sites is about the same for smokers and nonsmokers alike who work with asbestos.
 At present, it is not known what levels of exposure to asbestos, if any, is safe. Even a small amount may be dangerous in some circumstances.
 Asbestos-related disease usually takes 20 to 30 years from the time of exposure to become evident. Working with asbestos for even a short time could result in asbestos-related disease later on. *Page 18 
The letter, the article, and the brochure were all maintained in the possession of Maremont, and were turned over in discovery when the paralegal traveled to New York, New York to attend document production.
 {¶ 26} Turning to the second prong of the Fyffe test, we must consider whether there is a genuine issue of material fact as to whether Maremont had knowledge that harm was substantially certain to occur to its employees who were exposed to asbestos. One need only look to the attachments to the July 17, 1975 letter from the corporate director of environmental control of Raybestos Manhattan Co. to the executive director of FMSI, as well as the attachments, all in possession of Maremont, for support that exposure to asbestos creates almost certain harm to an employee.
 {¶ 27} Looking just at this small sampling of the evidence before the trial court, and construing this evidence in favor of the non-moving party, we conclude that there is a genuine issue of material fact with respect to whether Maremont knew that, by exposing its workers to asbestos, harm to those workers was substantially likely to occur.
 {¶ 28} Finally, third prong of the Fyffe test requires consideration of whether a genuine issue of material facts exists as to if Maremont, with knowledge of the danger of asbestos, acted to require Ynacio to continue to perform the dangerous task. One of the persons deposed in this case, Clifford Jones, worked with Ynacio and was, in fact, trained by Ynacio when he started at Maremont. He *Page 19 
stated that although safety procedures were instituted in the mid-1970's for working with asbestos, the employees were still required to work with the asbestos. It appears, from the evidence put forth by Connie that any, even protected, exposure to asbestos put an employee at risk. In "The Hazards of Asbestos for Brake Mechanics," it states "[c]ancer from asbestos is not limited to workers who handle the material. There are also reports of pleural and peritoneal mesothelioma * * * in persons with family, or neighborhood, or indirect occupational exposure to asbestos." Therefore, it appears that there is a genuine issue of material fact as to whether Maremont, with knowledge of the danger of asbestos, acted to require Ynacio to continue to perform a dangerous task, i.e., simply working in an environment that exposed him to asbestos.
 {¶ 29} Accordingly, as we find genuine issues of material fact as to all three prongs of the Fyffe test, Connie's assignment of error is sustained. Therefore, the January 9, 2007 judgment of the Paulding County Court of Common Pleas granting summary judgment in favor of Maremont is reversed and remanded for trial.
Judgment Reversed and Cause Remanded
 PRESTON, P.J., concurs.
 ROGERS, J., concurs separately.
 {¶ 30} I concur with the majority's conclusion that summary judgment was inappropriate. The majority opinion finds that certain "FMSI documents" were *Page 20 
properly authenticated under the ancient documents rule in Evid. R. 901(B)(8). The majority opinion surmises that, because Maremont was a member of FMSI during the time period covered by the documents, a Maremont employee was on the board of FMSI for a period of time, and FMSI regularly distributed informational documents to its members, the documents prepared and received by FMSI would logically be in Maremont's custody. I find this conclusion to be overreaching. I think that a question of fact exists as to whether the "FMSI documents" were received by Maremont's employee in his capacity as a board member of FMSI and he simply left them in Maremont's possession when he left the company, or whether the documents were received by this employee or other Maremont employees as agents of Maremont. If the documents were received by an employee in his capacity as an FMSI board member, then Maremont cannot be charged with knowledge of the contents without further evidence that the documents were, in fact, delivered to appropriate Maremont personnel. However, if it is established that the "FMSI documents" were received by a Maremont employee in his capacity as a Maremont employee, a fact finder might choose to give some weight to the documents as evidence that Maremont had knowledge of the dangers associated with the use of asbestos.
[1] Maremont was formerly known as "Grizzly Manufacturing" and is referred to as "Grizzly" or "Maremont-Grizzly" in some testimony and documents. *Page 1